ENTER NO JS-6 SEND



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.S.S. ENTERTAINMENT 2000, INC. dba THE PLAYPEN <br><br> Plaintiff, <br><br> vs. <br><br> ROCK STAR VIDEOS, INC.; TAKE-TWO INTERACTIVE SOFTWARE, INC., SONY COMPUTER ENTERTAINMENT OF AMERICA, INC; SONY COMPUTER ENTERTAINMENT, INC. <br><br> Defendants. | CASE NO. CV 05-02966 MMM (JTLx) <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

On April 22, 2005, plaintiff E.S.S. Entertainment 2000, Inc. filed this action against defendants Rockstar Games, Inc.[1] and Take-Two Interactive Software, Inc.[2] Plaintiff, which does business as the Play Pen Gentlemen's Club (the "Play Pen"), operates a club in Los Angeles that provides adult-oriented entertainment. Rockstar Games, which is a wholly-owned subsidiary of Take-Two Interactive, manufactures and distributes a video game known as "Grand Theft Auto:

---

[1]Rockstar Games, Inc. was erroneously sued as Rock Star Videos, Inc.

[2]The complaint also named Sony Computer Entertainment of America, Inc. and Sony Computer Entertainment, Inc. as defendants. Plaintiff dismissed these parties on May 19, 2005.

1  San Andreas." Plaintiff alleges that defendants have used the Play Pen's distinctive logo and trade

2  dress in Grand Theft Auto: San Andreas without its authorization, and created a likelihood of

3  confusion among consumers as to whether plaintiff has endorsed, or is associated with, the video

4  game.  Plaintiff asserts four claims: (1) trade dress infringement and unfair competition under

5  section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark infringement under

6  California Business and Professions Code § 14320; (3) unfair competition under Business and

7  Professions Code §§ 17200 et. seq.; and (4) unfair competition under California common law.[3]

8      Defendants have moved for summary judgment on all claims.

9

10  ## I. FACTUAL BACKGROUND

11  **A.    Background**

12      The Play Pen is a strip club located on the eastern edge of downtown Los Angeles at 1109

13  S. Santa Fe Avenue.[4]  The Play Pen's "logo" consists of the words "the Play Pen" (and the

14  lower- and upper-case letters forming those words) and the words "Totally Nude" displayed in

15

16

17  _____

   [3]The court earlier granted defendants' motion to dismiss plaintiff's claim for trademark
18  dilution under Business and Professions Code § 14330.

19      [4]Separate Statement of Undisputed Facts In Support of Motion of Defendants Rockstar
20  Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("Defs.' Facts"),
   ¶¶ 1, 2; Separate Statement in Support of Plaintiff's Opposition to Defendants Rockstar Games,
21  Inc. and Take-Two Interactive Software, Inc.'s Motion for Summary Judgment ("Pl.'s
22  Statement"), ¶¶ 1, 2.
       With their reply, defendants lodged a pleading captioned "Counter-Statement of
23  Undisputed Facts." (See Defendants Rockstar Games, Inc. and Take-Two Interactive Software,
   Inc.'s Counter-Statement of Undisputed Facts.)  Plaintiff objects to consideration of the pleading
24  on the ground that it is not authorized by the Local Rules, and requests that it be stricken. (See
25  Plaintiff's Objection to Defendants Rockstar Games, Inc. and Take-Two Interactive Software,
   Inc.'s Counter-Statement of Undisputed Fact.)    Although the court does not rely on the
26  document, it declines to strike it.  The practice of submitting a reply to an opponent's statement
   of genuine issues is a common one, which is often of great help to the court. See, e.g., *Palacio*
27  *v. Progressive Ins. Co.*, 244 F.Supp.2d 1040, 1047 (C.D. Cal. 2002); *Galen v. County of Los*
28  *Angeles*, 322 F.Supp.2d 1045, 1047 (C.D. Cal. 2004).

publicly available font, with a silhouette of a nude female dancer inside the stem of the first "P."[5]

Rockstar Games is the publisher of the Grand Theft Auto series of video games (the "Series"), including Grand Theft Auto: San Andreas ("San Andreas" or the "Game").[6] The Series is known for its signature brand of humor,[7] and consumers expect new games in the Series

---

[5]Defs.' Facts, ¶ 3.  In support of this statement, defendants cite plaintiff's Supplemental Response to Interrogatory No. 15, in which it described its service mark as "comprised of the term PLAYPEN, the font in which those words appear; the configuration of the words, THE PLAYPEN as it appears in signage, and in advertising and promotional materials; the use of the lower- and upper-case letters respecting those words; the use of a silhouette device of a woman in the stem of the first letter 'P' of the word, PLAYPEN." (Declaration of Eric J. German in Support of Motion of Defendants Rockstar Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("German Decl."), Exh. 6 (Fifth Supplemental Responses of Plaintiff E.S.S. Entertainment 2000, Inc., dba The Playpen to Defendant Rockstar Games, Inc.'s First Set of Interrogatories, Response to Interrogatory No. 15).)  Plaintiff disputes defendants' factual statement, but the evidence it cites does not substantiate the existence of a dispute.  (See Pl.'s Statement, ¶ 3 (Declaration of Robert F. Helfing in Support of Plaintiff's Opposition to Motion of Defendants Rockstar Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("Helfing Decl."), Exh. A at 4-6 (photographs showing signage on the building, which has the words "the Play Pen" and "Totally Nude," with a silhouette image of a nude woman in the stem of the first "P")).)

[6]Defs.' Facts, ¶ 4; Pl.'s Statement, ¶ 4.

[7]Defs.' Facts, ¶ 5; Pl.'s Statement, ¶ 5.  The parties dispute whether the Series' references are "parodic." (Id.)  Whether the Series or the San Andreas game constitutes a "parody" within the meaning of Mattel, Inc. v. Walking Mountain Productions, 353 F.3d 792 (9th Cir. 2003), and similar cases, is a legal question.  See id. at 801 ("The issue of whether a work is a parody is a question of law, not a matter of public majority opinion.  Forsythe correctly points out that Mattel presents no case law in support of its contention that the parodic nature of a defendant's work should be assessed using surveys and opinion testimony.  Forsythe is further correct that every court to address the issue whether a defendant's work qualifies as a parody has treated this question as one of law to be decided by the court," citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 582-83 (1994), Leibovitz v. Paramount Pictures Corp., 137 F.3d 109, 114-15 (2d Cir. 1998), and Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1400-01 (9th Cir. 1997) ("[U]nless the plaintiff's copyrighted work is at least in part the target of the defendants' satire, then the defendant's work is not a 'parody' in the legal sense . . ." (emphasis added by Walking Mountain)).  Therefore, this dispute does not raise a genuine issue of material fact.

3

1   to contain the same type of irreverent humor as earlier games.[8]

2       Each game in the Series is typically set in a cartoon-style city modeled after a real-world

3   urban center such as New York and Miami.[9]  To play San Andreas, or one of the other games in

4   the Series, players manipulate the story's protagonist and attempt to have him accomplish a series

5   of "missions."[10]  Players must complete the missions to advance the plot and ultimately win the

6   game.[11]  While plaintiff does not dispute that a player must complete set missions to "win," it

7   contends that games in the Series can be played without undertaking the missions.[12]

8       San Andreas is similar to the rest of the Series in style, game play, and tone.[13]  By playing

9   San Andreas, a player can experience the Game's version of West Coast "gangster" culture.[14]

10

---

11      [8]Defs.' Facts, ¶ 6; Pl.'s Statement, ¶ 6.  The parties disagree as to whether consumers

12   expect new games in the Series to be "parodic."  See *supra*, n. 7.

13      [9]Defs.' Facts, ¶ 8; Pl.'s Statement, ¶ 8.  The only point of dispute is whether the Series

14   "parodies" real-world locations.  See *supra*, n. 7.

15      [10]Defs.' Facts, ¶ 7; Pl.'s Statement, ¶ 7.

16      [11]Defs.' Facts, ¶ 9. See Declaration of Rowan Hajaj in Support of Motion of Defendants

17   Rockstar Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("Hajaj

     Decl."), ¶ 3 ("Players explore the city while performing the 'missions' to advance the plot and

18   to 'win' the game").

19      [12]Pl.'s Statement, ¶ 9. See Declaration of David A. Schnider in Opposition to Defendants'

     Motion for Summary Judgment ("Schnider Decl."), ¶ 6 ("[P]layers need not even undertake the

20   missions, but can simply direct the lead character in the commission of violent crimes"), ¶ 12 ("I

21   played the Game for approximately 45 minutes.  I never commenced any of the missions.  The

     only apparent limit on the amount of time the lead character could stay in the Pig Pen is the

22   player's ability to keep him from getting killed").

23      [13]Defs.' Facts, ¶ 11; Pl.'s Statement, ¶ 11.  Plaintiff does not dispute "that San Andreas

24   is similar to the rest of the series in tone generally, or in style or game play," but disputes that

     San Andreas has a "parodic tone."  As noted, this is a question of law, and does not raise a triable

25   issue of fact.  See *supra*, n. 7.

26      [14]Defendants argue that the Game "parodies" West Coast gangster culture. (Defs.' Facts,

27   ¶ 12 (German Decl., Exh. 9 (PC version of the San Andreas Game), Exh. 10 (Brady Games'

     Signature Series Guide to the PC and Xbox versions of San Andreas ("Signature Series Guide"));

28   Hajaj Decl., ¶ 10; Declaration of Nikolas Taylor in Support of Motion of Defendants Rockstar

The Game features three virtual cities, "Los Santos," "San Fierro," and "Las Venturas."[15] These locations are based on Los Angeles, San Francisco, and Las Vegas.[16] The "Los Santos" section of San Andreas is the Game's version of Los Angeles.[17] Gangs control the Los Santos streets, random gunfire frequently erupts, and drug dealers and prostitutes are common.[18] Los Santos police officers are corrupt.[19]

San Andreas was released to the public in the PlayStation 2 format in October 2004, and in the Xbox and PC formats in June 2005.[20] San Andreas was released to the public prior to the

---

Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("Taylor Decl."), ¶ 4; Declaration of Tara McPherson in Support of Motion of Defendants Rockstar Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("McPherson Decl."), Exh. 1 (Expert Report of Tara McPherson, Ph.D. ("McPherson Report") at 7).) Plaintiff counters that the Game makes no parodic comment on "gangster" culture, but allows the user to experience it vicariously. (Pl.'s Statement, ¶ 12 (German Decl., Exh. 10 (Signature Series Guide).) As noted, whether the Game constitutes a "parody" is a legal question. Thus, the parties' disagreement does not create a genuine dispute of material *fact. See supra*, n. 7.

[15]Defs.' Facts, ¶ 13; Pl.'s Statement, ¶ 13. See Hajaj Decl., ¶ 10; German Decl., Exh. 10 (Signature Series Guide).

[16]Defs.' Facts, ¶ 13; Pl.'s Statement, ¶ 13. Plaintiff does not dispute that the three cities depicted in San Andreas are based on Los Angeles, San Francisco, and Las Vegas; it merely contends that San Andreas does not "parody" these cities. See *supra*, n. 7.

[17]Again, the parties disagree as to whether the Game's depiction of Los Angeles is a "parody." (See Defs.' Facts, ¶ 14 (Hajaj Decl., ¶ 11; Taylor Decl., ¶ 4; McPherson Decl., Exh. 1 (McPherson Report at 7)). See Pl.'s Statement, ¶ 14 (German Decl., Exh. 10 (Signature Series Guide).) See *supra*, n. 7.

[18]Defs.' Facts, ¶ 15; Pl.'s Statement, ¶ 15.

[19]Defs.' Facts, ¶ 16 (German Decl., Exh. 9 (PC version of the San Andreas Game), Exh. 10 (Signature Series Guide); Hajaj Decl., ¶ 11). Plaintiff disputes this statement, but does not explain the basis of the dispute. (Pl.'s Statement, ¶ 16.) Nor does the evidence it cites substantiate the existence of any real dispute. (*Id.* (German Decl., Exh. 10 (Signature Series Guide), Exh. 11 (Plaintiff E.S.S. Entertainment 2000, Inc.'s Response to Defendant Take-Two Interactive's Second Set of Interrogatories)).)

[20]Defs.' Facts, ¶ 10; Pl.'s Statement, ¶ 10.

5

1  date of plaintiff's March 2005 California service mark registration.[21]  Millions of copies of San

2  Andreas have been sold.[22]

3  **B.   Los Santos**

4          Los Santos mimics the look and feel of actual Los Angeles locations.[23]  Like Los Angeles,

5  Los Santos is a hodgepodge of distinct areas, each with its own unique characteristics.[24]  Instead

6  of "Hollywood," "Santa Monica," "Venice Beach," and "Compton," Los Santos contains

7  "Vinewood," "Santa Maria," "Verona Beach," and "Ganton."[25]  The neighborhoods are

8  populated with cartoon-style liquor stores, ammunition dealers, casinos, pawn shops, tattoo

9  parlors, bars, and strip clubs, among other things.[26]  The brand names, business names, and other

10 aspects of the locations have been changed to fit the overall "Los Santos" theme and the Series'·

11 irreverent tone.[27]

12         The neighborhood of "East Los Santos" is the Game's version of East Los Angeles, or

13 more specifically, the eastern edge of downtown Los Angeles.[28]  Strip clubs, taco stands, and

14 warehouse-type architecture are found in this area of downtown Los Angeles.[29]  East Los Santos

15 _____

16         [21]Defs.' Facts, ¶ 84; Pl.'s Statement, ¶ 84.

17         [22]Defs.' Facts, ¶ 88; Pl.'s Statement, ¶ 88.

18         [23]Defs.' Facts, ¶ 17; Pl.'s Statement, ¶ 17.  Plaintiff's only dispute with defendants'
19 statement is that Los Santos mimics Los Angeles for "parodic effect."  See *supra*, n. 7.

20         [24]Defs.' Facts, ¶ 18; Pl.'s Statement, ¶ 18.

21         [25]Defs.' Facts, ¶ 19; Pl.'s Statement, ¶ 19.

22         [26]Defs.' Facts, ¶ 20; Pl.'s Statement, ¶ 20.  Plaintiff does not dispute that "Los Santos
23 contains animated versions of these businesses"; it merely contends that Los Santos contains other
   elements as well.

24         [27]Defs.' Facts, ¶ 21; Pl.'s Statement, 21.  Again, the only point of dispute is whether Los
25 Santos is a "parody" of Los Angeles.  See *supra*, n. 7.

26         [28]Defs.' Facts, ¶ 22; Pl.'s Statement, ¶ 22.  The parties' only dispute concerns whether
27 East Los Santos is a "parody" of East Los Angeles.  See *supra*, n. 7.

28         [29]Defs.' Facts, ¶ 23; Pl.'s Statement, ¶ 23.

1   mimics the look and feel of actual Los Angeles locations.[30]   One of the businesses located in East

2   Los Santos[31] is a virtual, cartoon-style strip club known as the "Pig Pen."[32]

3   **C.     Creation Of Los Santos And The Pig Pen**

4       Cartoon-style, animated graphics give San Andreas its particular look.[33]   Thousands of

5   virtual, cartoon-style locations are depicted in the game,[34] and it includes a disclaimer stating that

6   the locations depicted are fictional.[35]

7       A team of artists in Scotland animated San Andreas.[36]   Some of the artists who drew Los

8   Santos visited Los Angeles to take reference photographs for use as inspiration in creating the

9   Game's animated neighborhoods.[37]   The artists took photographs of various Los Angeles

10

11

12

---

13       [30]Defs.' Facts, ¶ 24; Pl.'s Statement, ¶ 24.

14       [31]Defs.' Facts, ¶ 34; Pl.'s Statement, ¶ 34.  Plaintiff disputes defendants' statement that

15   the Pig Pen is part of East Los Santos' "parody" of the eastern area of downtown Los Angeles.

16   See *supra*, n. 7.

17       [32]Defs.' Facts, ¶ 32.  Plaintiff does not dispute that the Pig Pen is found in the Los Santos

    section of the Game; it merely disputes defendants' characterization that the club is "buried" in

18   Los Santos.  (Pl.'s Statement, ¶ 32.)

19       [33]Defs.' Facts, ¶ 25; Pl.'s Statement, ¶ 25.

20       [34]Defs.' Facts, ¶ 29; Pl.'s Statement, ¶ 29.

21       [35]Defs.' Facts, ¶ 31; Pl.'s Statement, ¶ 31.

22       [36]Defs.' Facts, ¶ 26; Pl.'s Statement, ¶ 26.

23

24       [37]Defs.' Facts, ¶ 27 (Taylor Decl., ¶ 6 ("In March 2003, I, along with many of the other

    Rockstar North artists responsible for 'Los Santos,' took a reference trip to Los Angeles to take

25   photographs for use as inspiration for the Game's stylized, animated neighborhoods")).  Plaintiff

    responds that it is "[u]ndisputed that Nickolas [sic] Taylor and perhaps other artists took

26   photographs of actual Los Angeles as models for features in Los Santos." (Pl.'s Statement, ¶ 27.)

    Plaintiff does not specify which, if any, portion of defendants' statement it disputes, nor does it

27   proffer any evidence refuting any part of the statement.  As a result, the court finds there is no

28   material dispute regarding the factual statement.

businesses, streets, and other locations that appeared to fit the San Andreas theme.[38] The artists

who drew the Pig Pen took photographs of the Play Pen.[39] The artists used the photographs of

the Pig Pen and various other East Los Angeles locations to design aspects of the Pig Pen.[40]

When drawing Los Santos, the artists changed the names, building designs, and overall

look and feel of the locations and businesses they referenced to make them fit the virtual, cartoon-

style world of San Andreas and the Series' irreverent tone.[41] According to Nikolas Taylor, the

---

[38]Defs.' Facts, ¶ 28 (Taylor Decl., ¶ 6 ("A location scout took us to specific places that fit within San Andreas' parodic theme, including various Los Angeles businesses, residences, and public streets. When we arrived at a private establishment we wished to view from the inside, we waited outside while the location scout obtained permission for us to enter and to take photographs")). Plaintiff disputes defendants' factual statement, citing Taylor's deposition. (Pl.'s Statement, ¶ 28.) The cited deposition testimony does not directly rebut defendants' statement, however. (See Helfing Decl., Exh. D (Deposition of Nikolas Taylor ("Taylor Depo.") at 105:17-106:8 ("Q Okay. Did anything humorous about pigs in any way influence your artistic creation of the PIGPEN? A I can't remember. . . . Q As you sit here today can you think of anything funny about pigs that may have inspired or influenced your artistic rendition of the PIGPEN? A It just seemed, you know, to fit in")).)

[39]Defs.' Facts, ¶ 33; Pl.'s Statement, ¶ 33.

[40]Defs.' Facts, ¶¶ 35, 36; Pl.'s Statement, ¶¶ 35, 36.

[41]Defs.' Facts, ¶ 30 (Taylor Decl., ¶¶ 8-9). Plaintiff disputes this statement (Pl.'s Statement, ¶ 30), but the evidence it cites does not rebut defendants' contention that the artists changed aspects of the locations and businesses to make them fit the virtual world of San Andreas and the irreverent tone of the Series. (Helfing Decl., Exh. D (Taylor Depo. at 65:15-23 ("Q Now it has been alleged in legal documents in this case Sir that the purpose for changing the word play to pig is to indicate or parodise [that] patrons of these Gentlemen's Clubs are pigs, is that consistent with your artistic inspiration for making the changes? A No. Q So any representations to the extent of what I have just posed to you here would be incorrect? A That would be incorrect"), 105:17-106:8 (see *supra*, n. 38)).) Defendants' statement, in fact, is consistent with Taylor's earlier deposition testimony, in which he stated that he designed the Pig Pen to "ma[k]e it more follow the theme of the game, ma[k]e it more like part of the game, ma[k]e it more part of Los Santos as a virtual environment." (*Id.*, Exh. D (Taylor Depo. at 37:21-24).)

Defendants assert that the artists changed the look and feel of the businesses and locations to fit the Series' "critical" tone. (Defs.' Facts, ¶ 30.) The evidence they cite does not support this contention, however. (Taylor Decl., ¶ 8 (stating that changes were made "in order to be funny"), ¶ 9 (Los Santos "significantly twists, distorts, and changes [the references] to be funny")); McPherson Decl., Exh. 1 (McPherson Report at 7 (presenting an expert's views that

1 Lead Map Artist for the Los Santos section of San Andreas, he and other artists purposely made

2 these alterations because they did not seek to "re-creat[e] a realistic depiction of Los Angeles;

3 rather, [they] were creating 'Los Santos,' a fictional city that lampooned the seedy underbelly of

4 Los Angeles and the people, businesses and places [that] comprise it."[42] Taylor agreed, however,

5 that he did not choose the word "Pig" because he wanted to parody strip club patrons, or because

6 he found anything humorous about pigs.[43]

7 ### D.   Comparison Between The Pig Pen And The Play Pen

8 The Pig Pen building is a totally different size, color, shape, and structure than the Play

9 Pen building.[44]  Furthermore, unlike the Play Pen, the Pig Pen does not have a stone facade, a

10 valet stand, large plants and gold columns around the entrance, or a six foot black iron fence

11 surrounding the parking lot.[45]  Although the Pig Pen and the Play Pen both have pole signs, the

12 ───────────────

13 San Andreas's virtual radio stations feature "outrageous commentary and a scathing critique of

14 talk radio"), 10 (discussing differences between the fictional 'The Pig Pen' and the strip club 'The Play Pen'")).)

15 [42]Defs.' Facts, ¶ 30 (Taylor Decl., ¶ 8).

16 [43]Pl.'s Statement, ¶ 30 (Helfing Decl., Exh. D (Taylor Depo. at 65:15-23, 105:17-106:8)).

17 [44]Defs.' Facts, ¶ 39; Pl.'s Statement, ¶ 39.

18 [45]Defs.' Facts, ¶ 40 (German Decl., Exh. 1 (Deposition of Edmond Adaimy ("Adaimy

19 Depo") at 247:5-251:23 ("Q. Okay.  Is there a stone facade on the front of the [Play Pen]

20 building?  A. Yes. . . .  Q. . . Have the stones always been there on the front of the building as

21 long as The Playpen has been open?  A. I think they were there when we opened.  Q. Are there plants or trees on either side of the front door to the Playpen building?  A. Yes. . . .  Q. When

22 did you put those trees and those plants in?  A. When we opened the place.  Q. So since you

23 opened the place, there's always been trees and plants on the side – A. Yes.  We added a few more trees and stuff. . . .  Q. Is there a fence around the property?  A. Yes.  Q. What type of

24 fence is it?  A. Iron fence.  Q. Describe it.  A. Iron fence that goes from the side door all the way

25 around to the entrance of the covered parking.  Q. Does it completely surround the parking lot? A. Yes.  It enclosed the entire – when you pull the door shut, the place is – I mean, nobody can

26 drive in or out. . . .  Q. How high is the fence?  A. Probably six feet or six and a half.  Q. What color is the fence?  A. Black.  Q. It is noticeable?  A. Yes.  Q. Does everyone who comes in the

27 club see the fence?  A. Yes.  Q. Is it unique to your club, the fact that there is a fence around the parking lot?  A. Not that many parking lots have a fence around it, but there are some that do

28 have fence around it.  Q. Has it always been there since you opened the club?  A. Yes.  Q. So

1  signs have different color schemes.  Moreover, unlike the Play Pen's pole sign, the Pig Pen's sign

2  has no trio of nude silhouettes above the logo, and no separate "totally nude" sign below.[46]

---

4  everyone who has ever seen The Playpen club has seen the black iron fence, correct?  A. Yes,

5  I think"), 252:10-21 ("Q. Do you offer valet parking at The Playpen Club?  A. Yes.  Q. Is there

6  a valet stand in front of The Playpen club?  A. Yes.  Q. Has that valet stand always been there

   in the whole time you were open?  A. Always.  A. Is it always there?  Every time someone comes

7  in the club, you see a valet stand?  A. Always there, always"), Exh. 2 (Deposition of Abner

8  Pajounia ("Pajounia Depo.") at 217:10-219:7 ("Q. Tell me what's different [between the Pig Pen

   and the Play Pen]?  A. Playpen is one story.  This is several story.  Playpen got no windows.

9  Actually, any strip club don't have any windows.  This one has windows.  Playpen has an

   awning.  This one has an awning.  Q. You said the awning is different, right?  A. They shaped

10  it a little different.  The logo is the same.  The font is the same. . . . Q. The Pigpen is not the

    same color as the Playpen, the building, correct?  A. Correct.  Q. Are there gold columns inside

11  the doorway to the Playpen?  A. Yes, there are.  Q. Are there gold columns inside the doorway

12  of the Pigpen?  A. On this picture, no.  Q. Are there in any picture that you've ever seen?  A.

    No.  Q. Let's take a look at – is there a valet stand in front of the Playpen when the club is open?

13  A. Yes.  Q. Is there a valet stand in front of the Pigpen?  A. No.  It's a pig house.  There is no

    valet.  How could the pig house have a valet?")))

14
       Plaintiff attempts to refute defendants' statement, citing photographs of the Pig Pen and

15  the Play Pen.  (See Pl.'s Statement, ¶ 40.)  The photographs support defendants' contention that

16  unlike the Play Pen, the Pig Pen does not have a stone facade, a valet stand, large plants and gold

    columns around the entrance, or a six foot black iron fence surrounding the parking lot.

17  (Compare Helfing Decl., Exh. A at 6-8 (photographs of the Play Pen) with *id.*, Exh. B at 13-14

    (photographs of the Pig Pen).)

18
       [46]Defs.' Facts, ¶ 41 (German Decl., Exh. 1 (Adaimy Depo. at 246:5-16 ("Q. Is there

19  anything about the exterior of the club that you think is distinctive or important to identify your

20  club?  A. Well, we have these three ladies on the top here.  Q. Of the sign.  You are pointing on

    page 9 of Exhibit 200?  A. Yes.  They light up in neon, on and off.  Q. So is that an important

21  feature, those neon ladies on top of the sign?  A. Well, they kind of attract the eyes")), Exh. 2

22  (Pajounia Depo. at 224:12-225:12 ("Q. What is different about [the pole signs for the Play Pen

    and the Pig Pen?]  A. My sign is red.  This is pink.  What else is different?  A. This one is, it

23  doesn't have the ladies on the top, the silhouettes.  Q. The Pigpen doesn't have the silhouettes or

    the lady on top of the sign?  A. Exactly.  My sign has the silhouette on the top, three ladies, and

24  this one has no silhouettes.  My sign has a frame that is blue.  Your client's sign doesn't have any

25  framing.  My sign has the – they have the 'totally nude' there, too.  Same font, yeah.  Q. But on

    the pole, is there a separate neon sign on the Playpen sign that says 'totally nude'?  A. Yes.  Q.

26  Is that on The Pigpen sign?  A. No.  They took that off.  Q. And – A. They add the totally –

27  yeah, they have the 'totally nude' like mine, the same font.  Q. Are those signs the same colors?

    A. No.  One is pink, one is red.  Your client's is pink.  I said that earlier.  Mine is red.  I have

28  the hot red")))

1  Pointing to these differences, defendants contend that the Pig Pen building was not modeled after

2  the Play Pen building, but rather after another structure in the same neighborhood as the Play

3  Pen.[47]  While plaintiff does not dispute that the Pig Pen building differs from that of the Play Pen

4  in certain respects, it contends that the two clubs have similar awnings and logos.[48]

5       The logo on the pole sign in a corner of the Play Pen parking lot is different from the logo

6  that appears on the awning above the Play Pen door in certain respects.[49]  This is because there

7  is no physical master or precise template for the Play Pen logo.[50]  How to draw the silhouette of

8  ────────────────────

9       Plaintiff purports to dispute this statement (See Pl.'s Statement, ¶ 41), but the photographs

10  actually support defendants' representations regarding the pole signs of the Pig Pen and the Play
Pen.  (Compare Helfing Decl., Exh. A at 7 (photographs of the Play Pen's pole sign) with id.,

11  Exh. B at 13-14 (photographs of the Pig Pen's pole sign).)

12      [47]Defs.' Facts, ¶ 38 (German Decl., Exh. 2 (Pajounia Depo. at 217:10-219:7); Taylor

13  Decl., ¶ 14 ("I made the exterior of the Pig Pen look different from the exterior of the Playpen
in several respects. . . .  For example, I did not model the Pig Pen building after the Playpen

14  building.  Instead, I used another building from the Playpen's neighborhood as inspiration")).

15      [48]Pl.'s Statement, ¶ 38 (compare Helfing Decl., Exh. A at 6-8 (photographs of the Play

16  Pen's awning and logo) with id., Exh. B at 13-14 (photographs of the Pig Pen's awning and
logo)).

17
    [49]Defs.' Facts, ¶ 65 (German Decl., Exh. 3 (Plaintiff E.S.S. Entertainment 2000, Inc.'s

18  Second Supplemental Response to Defendant Rockstar Games, Inc.'s Third Set of Requests for

19  Admission, RFA No. 65 ("Request for Admission No. 65  Admit that the silhouette depicted on
the awning above the front door of the building located at 1109 S. Santa Fe Ave., Los Angeles,

20  California, is different from the silhouette depicted on the sign on the tower in the northeast
corner of the parking lot located at 1109 S. Santa Fe Ave. Los Angeles CA.  Response to Request

21  for Admission Nol. 65  Admit"))).  Plaintiffs do not dispute that differences exist in some details.

22  (Pl.'s Statement, ¶ 65.)

23      [50]Defendants contend that "[n]o precise template exists for the Playpen logo."  (Defs.'

24  Facts, ¶ 66 (German Decl., Exh. 1 (Adaimy Depo. at 191:5-193:17 ("Q. So what is depicted on
page 12 of the Complaint?  What is that a picture of?  A. This is the awning of The Playpen.  Q.

25  That's at the front door of the club where the customers come in?  A. Yes.  Q. So that woman
in that stem of that P is slightly different than the woman on the sign out in front of the club; is

26  that correct?  A. Yes.  Again, because of the P here being much bigger.  So they ratioed down

27  – I guess they ratioed down as much as they can of the P. . . .  Q. The hairstyle is a little
different, correct?  A. Yes, a little bit different.  They put it in like a little something here.  They

28  could never draw the same silhouette.  Q. Oh.  So the silhouette is never exactly the same way

1  the nude female dancer in the Play Pen logo is left to each artist who draws it, although the final

2  drawing must be acceptable to the Play Pen's owners.[51]  There are several different versions of

3  the silhouette used in the Play Pen logo.[52]  In fact, some advertisements and signs for the Play Pen

4  do not contain the silhouettes of the nude females.[53]

5  _____

6  twice; is that correct?  A. Well, it depends on the person that draws it.  Q. Right. So what is
   important about the logo is that there is some silhouette – A. Right.  Q. – but it doesn't matter

7  exactly how the silhouette looks; is that correct?  A. It has to look acceptable.  Q. Acceptable to

8  who?  A. To me or to my partner or to both of us.  Q. But you don't care if it is exactly the same
   woman in exactly the same – A. We try to get it as close as possible.  But then, you know,

9  sometimes it doesn't work.  Q. There is not like a master silhouette.  A. No.  We don't have it
   in a stamp that we take and stamp it in the P and say – Q. So each time someone makes a new

10  sign or a new ad or a new thing, they draw the woman again?  A. Uh-huh.  Q. And it might be

11  slightly different?  A. Right")).)  Plaintiff disputes this statement, but concedes that there is no
    stamp or other physical master for the logo.  (Pl.'s Statement, ¶ 66.)

12
    [51]A fair reading of Adaimy's testimony is that while the details of the silhouettes are
13  initially left to the artists, the final drawings must be acceptable to Adaimy or his partner.  (Defs.'

14  Facts, ¶ 66 (Adaimy Depo. at 191:5-193:17); Pl.'s Statement, ¶ 66 (same).)

15      [52]Defs.' Facts, ¶ 86 (German Decl., Exh. 1 (Adaimy Depo. at 187:4-14 ("Q. Is it fair to
    say that the silhouette of the woman is an important part of the logo?  A. I would think so.  Q.
16  When you ever notice different versions of the woman in the silhouette in the logo, is it always

17  the same woman, drawn the same way?  A. Sometimes it doesn't come out this way.  Sometimes
    the arm is more stretched.  Sometimes the hair is different.  Yes, I have noticed sometimes it is
18  not exactly the same.  Sometimes the legs are more bent"), 189:23-190:9 ("Well, the silhouette,

19  of course, is in the logo.  But then the way some people draw it, you know, they don't draw it
    similar, you know.  It is a silhouette and the silhouette is . . .  Q. So different people might draw
20  the logo in different ways, correct?  A. Yes.  They do it maybe a little different with the hand,
    with the leg, with the arm.  Q. There are lots of different things that might be slightly
21  different"))).  Plaintiff disputes this statement, citing photographs of the Play Pen building.  (Pl.'s

22  Statement (Helfing Decl., Exh. A at 4-7 (photographs of the Play Pen logo on various parts of
    the building)).)  The photographs support defendants' contention that there are several different
23  versions of the silhouette used in the Play Pen logo.  For instance, the silhouette on the awning
    has rounder curves than the silhouette located on the side of the building.  (Compare Helfing
24  Decl., Exh. A at 6 with id., Exh. A at 4.)  The silhouette on the pole sign is in a slightly different

25  position than the others; the pole sign also features three silhouettes on top of the logo.  (See id.,
    Exh. A at 7.)
26
        [53]Defendants contend that plaintiff's use of its Play Pen logo has been "highly
27  inconsistent."  (Defs.' Facts, ¶ 85.)  Plaintiff disputes this.  (Pl.'s Statement, ¶ 85.)  Defendants'

28  evidence does not support their characterization that use of the Play Pen logo has been "highly

1    The Play Pen logo is written in a publicly available font.[54]  Defendants contend that some

2    of the letters of the Pig Pen logo are in a different font than they are in the Play Pen logo.[55]

3    Plaintiff disputes this, and contends that the two logos use the same font.[56]

4    **E.    Features Of Strip Clubs In General**

5    Strip clubs other than the Play Pen have round awnings[57] because awnings provide shelter

---

inconsistent"; the evidence merely shows that certain advertisements and signs for the Play Pen
have omitted the nude silhouettes. (German Decl., Exh. 2 (Pajounia Depo. at 17:11-22 (stating
that the exterior of the Play Pen has been remodeled, but the logo has remained the same), 19:6-
19 (testifying that the awning above the door says, "Play Pen" but does not have the logo), 20:3-9
(same), 20:25-21:13 (stating that plaintiff uses different versions of the Play Pen logo on some
billboards and on one truck "[b]ecause these logos, they might be either the billboard is next to
a church or to a school and the truck goes to the Staples Center where there are kids around, so
we just want to cut down a little nudity of the logo and the pictures that we, you know, we
advertise"), 22:2-23:17 ("I know there are two or three billboards that specify they're close to
school and church that I ask him to take the silhouette and be a little bit more careful about the
picture of the two ladies on the billboard")); see also Declaration of Dr. Carol Scott in Support
of Motion of Defendants Rockstar Games, Inc. and Defendants Rockstar Games, Inc. and Take-
Two Interactive Software, Inc. for Summary Judgment ("Scott Decl."), ¶ 16 ("The Playpen logo
is not used consistently").)  Plaintiff's photographs also show that its use of the Play Pen logo,
at least on the building that houses the club, has not been "highly inconsistent." (Pl.'s Statement,
¶ 85 (Helfing Decl., Exh. A at 4-7 (photographs of the Play Pen logo on various parts of the
building)).)

[54]Defs.' Facts, ¶ 36.  Plaintiff Pl.'s Statement, ¶ 36.

[55]Defs.' Facts, ¶ 72 (Taylor Decl., ¶ 14 ("I also changed the Playpen logo.  For example,
I made the Pig Pen silhouette slightly different and used a different font on portions of the Pig Pen
logo")).

[56]Pl.'s Statement, ¶ 72 (Helfing Decl., Exh. A at 4 (photograph of Play Pen logo), Exh.
B at 11 (photograph of Pig Pen logo)).

[57]Defendants contend that "many" strip clubs have round awnings. (Defs.' Facts, ¶ 58.)
Plaintiff counters that only "some" strip clubs have round awnings.  The testimony cited by
defendants supports plaintiff's position.  (See German Decl., Exh. 1 (Adaimy Depo. at 263:24-
264:6) ("Q. Does the Spearmint Rhino have an awning?  A. Oh, sure.  Spearmint Rhino has an
awning.  Q. Do any of the other strip clubs that are your competitors have awnings?  A. Well,
some have, some don't.  Some have, some don't")).

from the weather.[58]  Many strip clubs also have parking lots.[59]  Many businesses are located on the southwest corner of an intersection,[60] and placing a pole sign in the corner of a strip club parking lot closest to the intersection is not unique.[61]

Many strip clubs display silhouettes of nude female dancers on the exterior of the building or in their logo.[62]  Displaying silhouettes of nude female dancers outside a strip club lets customers know what to expect inside the club.[63]  Many strip clubs also use the phrase "totally nude" outside the club or in their logo[64] to tell customers that their dancers are totally nude.[65]

Defendants' expert conducted an Internet search and found websites for at least six other strip clubs and sex-themed establishments in the United States that use the term "Play Pen" or "Playpen."[66]  The Internet also contains information about "Playpen" suites in a high-end Las

---

[58]Defs.' Facts, ¶ 59; Pl.'s Statement, ¶ 59.

[59]Defs.' Facts, ¶ 61; Pl.'s Statement, ¶ 61.

[60]Defs.' Facts, ¶ 60; Pl.'s Statement, ¶ 60.

[61]Defs.' Facts, ¶ 62; Pl.'s Statement, ¶ 62.

[62]Defs.' Facts, ¶ 52.  Plaintiff does not dispute that many strip clubs display silhouettes; it disputes, however, that any unrelated club uses a silhouette similar to that in the Play Pen logo. (Pl.'s Statement, ¶ 52.)

[63]Defs.' Facts, ¶ 51; Pl.'s Statement, ¶ 51.

[64]Defs.' Facts, ¶ 54; Pl.'s Statement, ¶ 54.

[65]Defs.' Facts, ¶ 53; Pl.'s Statement, ¶ 53.

[66]Defs.' Facts, ¶ 55 (Scott Decl., ¶ 17, Exh. 3).  Plaintiff argues that Exhibit 3 to Scott's declaration, which contains website printouts showing other uses of the "Play Pen" name, constitutes hearsay and cannot be considered in deciding this motion. (Pl.'s Statement, ¶ 17; see also Plaintiff's Evidentiary Objections in Support of Opposition to Motion of Defendants Rockstar Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("Pl.'s Evid. Obj."), No. 3.)  Because defendants do not offer the website printouts for the truth of their content, but merely to show that certain sex-themed establishments advertise their businesses using the terms "Play Pen" or "Playpen," the court overrules plaintiff's objection.

1  Vegas hotel; each suite contains an in-room "stripper's pole."[67]  In addition, there is information

2  on the Internet regarding a theme night at a Hollywood nightclub known as the "Playpen," which

3  featured performances by adult film stars.[68]

4      **F.**    **Advertising And Relevant Consumer Markets**

5          **1.**    **The Play Pen**

6      The Play Pen has roughly 30,000 "admissions" per year;[69] on any given day, up to 35

7  percent of Play Pen admissions come from repeat customers.[70]  Plaintiff markets its services in

8  local print advertising (particularly, Spanish-language newspapers) and some small out-of-state

9  publications, on the radio, and on a few billboards in and around the Los Angeles area, most of

10  which do not feature the version of the logo with the nude, female silhouette.[71]

11      Plaintiff uses the word "play" in its "Play Pen," "Players," and "Playclubs.net"

12  businesses.[72]  The creator of the Play Pen came up with the phrase "Play Pen," because it suggests

13  a place where men can go to play.[73]

14          **2.**    **The Pig Pen And The San Andreas Game**

15      Rockstar Games has advertised San Andreas via television commercials on national

16  

17      [67]Defs.' Facts, ¶ 56 (German Decl., Exh. 7).  Plaintiff does not dispute that one hotel
offers "Playpen" suites.  (Pl.'s Statement, ¶ 56.)

18
19      [68]Defs.' Facts, ¶ 57; Pl.'s Statement, ¶ 57.

20      [69]Defs.' Facts, ¶ 63; Pl.'s Statement, ¶ 63.

21      [70]Defs.' Facts, ¶ 64; Pl.'s Statement, ¶ 64.

22      [71]Defs.' Facts, ¶ 76; Pl.'s Statement, ¶ 76.

23      [72]Defs.' Facts, ¶ 73; Pl.'s Statement, ¶ 73.

24      [73]Defs.' Facts, ¶ 75; Pl.'s Statement, ¶ 75.  See German Decl., Exh. 1 (Adaimy Depo.

25  at 163:6-15 ("Q. Did you think it was a good name when you first heard it? A. Yes. Q. Why?

26  A. Well, it's like children playing in a box.  So we have guys that come in and the box is the

27  club, and then the guy's come in and play in the box.  Q. It kind of gave you the idea that it
would be a place where guys would come to play?  A. Uh-huh"), 164:15-20 ("Q. And so you
came up with The Playpen name?  A. Right.  Q. And you thought that that was a good name

28  because it was a place where guys came to play; is that correct?  A. Correct")).

networks and print advertisements in national magazines.[74]  The Pig Pen does not appear in any of San Andreas's advertising or promotional materials.[75]  Nor does it appear on the Game's exterior packaging.[76]  The Pig Pen is not visible to consumers until after they purchase the Game, insert it into a computer or other player, and actually play the Game.[77]

The Pig Pen is just one of hundreds of locations in Los Santos section of San Andreas.[78] A player who wishes to visit the Pig Pen may do so; there is a weapon available on the roof of the building.[79]  None of San Andreas's missions specifically directs the player to the Pig Pen, however.[80]  It is possible to play San Andreas for many hours and even to win the game without ever seeing the Pig Pen.[81]

---

[74]Defs.' Facts, ¶ 45; Pl.'s Statement, ¶ 45.

[75]Defs.' Facts, ¶ 46; Pl.'s Statement, ¶ 46.

[76]Defs.' Facts, ¶ 44; Pl.'s Statement, ¶ 44.

[77]Defs.' Facts, ¶ 83; Pl.'s Statement, ¶ 83.

[78]Defendants contend that there are over one thousand locations in Los Santos.  (Defs.' Facts, ¶ 42 (Hajaj Decl., ¶ 12 ("The Pig Pen is just one of over 1,000 locations in the 'Los Santos section of San Andreas . . .")).  Plaintiff contends that the number of locations in Los Santos that players can actually go in and do things is in the hundreds.  (Pl.'s Statement, ¶ 42 (Helfing Decl., Exh. I (Deposition of Bradford Cornell ("Cornell Depo.") at 55:1-4 ("Q. BY MR. HELFING: How many depositions are there in Grand Theft Auto: San Andreas?  How many places can the main character, Carl Johnson, go to and do things?  A. Hundreds")).)  Whether there are "hundreds" of locations, or "over a thousand," is immaterial to the resolution of this motion.

[79]See German Decl., Exh. 10 (Signature Series Guide at 14).

[80]Defs.' Facts, ¶ 47 (German Decl., Exh. 10 (Signature Series Guide at 18-61); Taylor Decl., ¶¶ 11, 12; McPherson Decl., Exh. 1 (McPherson Report at 11)).  Plaintiff disputes this statement, but the evidence it cites does not reveal any dispute.  (Pl.'s Statement, ¶ 47 (Helfing Decl., Exh. I (Cornell Depo. at 55:1-56:4 (testifying that the main character, Carl Johnson, can obtain a weapon at the Pig Pen, but stating that he did not view the Pig Pen "being prominently featured in that regard")).)

[81]Defs.' Facts, ¶ 49 (Taylor Decl., ¶¶ 11-13; Hajaj Decl., ¶¶ 12, 13; McPherson Decl., Exh. 1 (McPherson Report at 11)).

### 3.   Relevant Consumer Markets

Strip club patrons exercise some degree of care in selecting which club to attend.[82]   Video

game players are knowledgeable consumers.[83]

Strip clubs and video games are not related products.[84]   The Play Pen is a public

establishment, where food and refreshments are served and live nude dancers perform.[85]   Video

games such as San Andreas are generally played at home, sitting in front of a screen.[86]   Although

---

[82]Defs.' Facts, ¶ 77.  Plaintiff disputes this statement, but the evidence cited does not show
the existence of a dispute.  (Plaintiff's Statement, ¶ 77 (German Decl., Exh. 1 (Adaimy Depo.
at 266:3-15 ("Q. Do you think customers are choosey about which strip club they want to attend?
A. Choosy?  Q. Do they care which one they go to?  A. Yes.  Q. Do they pay attention to which
one they're going to?  A. Yes.  Q. Do they do research into which one they want to go to?  A.
Well, they feel comfortable in a certain area or in a certain place, that's where they are going to
go")).)

[83]Defs.' Facts, ¶ 78; Pl.'s Statement, ¶ 78.

[84]Defendants contend not only that strip clubs and video games are unrelated products, but
that they "are not complementary products, and are not sold to the same class of purchasers."
(Defs.' Facts, ¶ 69.)   The evidence defendants proffer does not support the latter assertion.
(German Decl., Exh. 1 (Adaimy Depo. at 209:4-6 (agreeing that an adult bookstore is not "the
same type of business as a strip club"), 210:23-211:8 (explaining how an adult video store is
different from a strip club), 212:9-18 (stating that Playboy magazine is a "totally different
business" from the Play Pen), 213:9-22 (explaining how Playboy magazine is different from a
strip club)), Exh. 3 (Plaintiff E.S.S. Entertainment 2000, Inc.'s Second Supplemental Response
to Defendant Rockstar Games, Inc.'s Third Set of Requests for Admission, RFA No. 70 (merely
admitting "that a video game is different from a strip club")), Exh. 5 (Supplemental Responses
of Plaintiff E.S.S. Entertainment 2000, Inc., dba The Playpen to Defendant Rockstar Games,
Inc.'s First Set of Requests for Admissions, RFA No. 4 (admitting "that DEFENDANTS do not
directly compete with YOU for customers")); Scott Decl., ¶ 18 (stating that "[p]laintiff's strip
club and San Andreas are not related in the minds of consumers"); McPherson Decl., Exh. 1
(McPherson Report at 10 (opining that "[v]ery different systems of regulation apply to the two
products, indicating clear levels of difference between the two products.  Rockstar's goods and
The Play Pen's services are not related")).)

[85]Defs.' Facts, ¶ 71; Pl.'s Statement, ¶ 71.

[86]Defs.' Facts, ¶ 70; Pl.'s Statement, ¶ 70.

1   there may be an overlap in terms of customers,[87] the Play Pen and San Andreas do not directly

2   compete for purchasers.[88]  Plaintiff is not now and has never been in the video game business, and

3   has no plans to enter that business.[89]  Defendants have never been in the strip club business and

4   have no plans to enter that business.[90]

5           **4.     Dr. Carol Scott's Survey**

6           Defendants' expert, Dr. Carol Scott, conducted a survey of 503 San Andreas players.  The

7   players were shown a screen shot of the Pig Pen and asked what, if anything, the image called to

8   mind.  Of the 503 players surveyed, sixteen mentioned "the Play Pen,"[91] while twenty-seven said

9   the Pig Pen was a generic strip club.[92]  Five thought that the Pig Pen was endorsed by, sponsored

10  by, or affiliated with the Play Pen.[93]  Dr. Scott asked survey respondents whether they had been

---

12  [87]Pl.'s Statement, ¶ 69 (Helfing Decl., Exh. J at 229 (Deposition of Carol A. Scott, Exh.
13  10 (showing that of the 503 San Andreas players surveyed, 30.0% had been to an adult
14  entertainment or gentlemen's club in the past year, and 33.6% planned to go to an adult
    entertainment or gentlemen's club in the next year))).

15  [88]Defs.' Facts, ¶ 69 (German Decl., Exh. 5 (Supplemental Responses of Plaintiff E.S.S.
16  Entertainment 2000, Inc. dba The Playpen to Defendant Rockstar Games, Inc.'s First Set of
    Requests for Admissions, RFA No. 4)).

17  [89]Defs.' Facts, ¶ 79; Pl.'s Statement, ¶ 79.
18

19  [90]Defs.' Facts, ¶ 80; Pl.'s Statement, ¶ 80.

20  [91]Defs.' Facts, ¶ 68.  Plaintiff does not dispute that 16 of the 503 persons surveyed
    mentioned the Play Pen; rather, it disputes "the argumentative characterization of the amount as
21  'only 16.'" (Pl.'s Statement, ¶ 68.)

22  [92]Defs.' Facts, ¶ 87; Pl.'s Statement, ¶ 87.
23
    [93]Defs.' Facts, ¶ 81.  Plaintiff does not dispute that five of the survey participants stated
24  they thought the Play Pen club sponsored, endorsed, or was affiliated with San Andreas; it merely
    disputes defendants' "argumentative characterization of the amount as 'only 5.'"  (Pl.'s
25  Statement, ¶ 81.)

26          Defendants contend that "[p]laintiff does not know the name of a single consumer who
    claims to have been actually confused as to the sponsorship or endorsement of San Andreas."
27  (Defs.' Facts, ¶ 75.)  Plaintiff does not dispute this, but contends that it has "requested the
    supporting documentation of defendants' survey which contains the name of at least five persons
28  who were confused," and that "[d]efendants have not yet complied." (Pl.'s Statement, ¶ 75.)

1   in a strip club or planned to go to a strip club.  Of the consumers who answered yes, 4.4 percent

2   thought that the Pig Pen was endorsed by, sponsored by, or affiliated with the Play Pen.[94]

3

4                                      **II.  DISCUSSION**

5   **A.    Legal Standard Governing Motions For Summary Judgment**

6          A motion for summary judgment must be granted when "the pleadings, depositions,

7   answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

8   there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

9   as a matter of law."  FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the

10  initial burden of informing the court of the basis for its motion and of identifying those portions

11  of the pleadings and discovery responses that demonstrate the absence of a genuine issue of

12  material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party

13  will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

14  no reasonable trier of fact could find other than for the moving party.  On an issue as to which

15  the nonmoving party will have the burden of proof, however, the movant can prevail merely by

16  pointing out that there is an absence of evidence to support the nonmoving party's case.  See *id.*

17  If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or

18  as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

19  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986);  FED.R.CIV.PROC. 56(e).

20         In viewing evidence at the summary judgment stage, the court does not make credibility

21  determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

22

23  It is undisputed that five respondents believed the Play Pen had sponsored or was affiliated with

24  San Andreas.  (Defs.' Facts, ¶ 81; Pl.'s Statement, ¶ 81.)  Whether or not plaintiff knows the
    names of these individuals is immaterial to the legal issues presented in the motion.  Thus, the

25  court does not take this dispute into account in deciding the motion.

26         [94]Defs.' Facts, ¶ 82.  Plaintiff does not dispute that 4.4 percent of respondents who stated

27  that they had been to a strip club or planned to go to one thought that the Play Pen sponsored,
    endorsed,  or  was  affiliated  with  San  Andreas;  plaintiff  merely  disputes  defendants'

28  "argumentative characterization of the amount as 'only 4.4%.'"  (Pl.'s Statement, ¶ 82.)

favorable to the nonmoving party.  See *T. W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  The evidence presented by the parties must be admissible.  FED.R.CIV.PROC. 56(e).  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**B.     Plaintiff's First Cause Of Action For Trade Dress Infringement And Unfair Competition**

Plaintiff's first cause of action asserts a claim for trade dress infringement and unfair competition[95] under § 43(a) of the Lanham Act.  Section 43(a) prohibits use of a "word, term, symbol, or device," or a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a); see *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1106 (9th Cir. 1992) ("Section 43(a) of the Lanham Act . . . prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services").

"For a number of years after [Section 43(a)] was enacted, courts construed it narrowly to include only two kinds of wrongs: false advertising and the common-law tort of 'passing off'

---

[95]Although the complaint is somewhat unclear, plaintiff's claim for unfair competition appears to be premised both on infringement of its trade dress and infringement of its unregistered trademark, i.e., its allegedly distinctive logo.  Because the Lanham Act does not distinguish between trade dress and trademark, the court analyzes the two claims together.  See *Walking Mountain*, 353 F.3d at 809 n. 17 ("Our *trademark* infringement caselaw is generally applicable to our resolution of Mattel's claim that Forsythe infringed its Barbie *trade dress* because the Supreme Court has clearly stated that trade dress and trademark infringement are very close cousins, both seeking to protect a designation of origin," citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992) (stating that "§ 43(a) [of the Lanham Act, codified at 11 U.S.C. § 1125,] provides no basis for distinguishing between trademark and trade dress. . . . There is no persuasive reason to apply different analysis to the two. . ." (internal citations omitted))).

20

one's goods as those of another." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998). Over time, however, "the section has been widely interpreted to create, in essence, a federal law of unfair competition." *Two Pesos*, 505 U.S. at 780 (Stevens, J. concurring); see *Kendall-Jackson*, 150 F.3d at 1046.

There are two bases for liability under section 43(a): "(1) false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ('false association'), and (2) false representations in advertising concerning the qualities of goods or services ('false advertising')." *Waits*, 978 F.2d at 1108. "A trademark is a word, phrase or symbol that is used to identify a manufacturer or sponsor of a good or the provider of a service." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (citing *New Kids on the Block v. News Am. Publishing, Inc.*, 971 F.2d 302, 305 (9th Cir. 1992)), cert. denied, 537 U.S. 1171 (2003). In contrast, "trade dress involves the total image of a product and 'may include features such as size, shape, color, color combinations, texture, or graphics.'" *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989) (quoting *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987)). Infringement of an unregistered trademark constitutes unfair competition under the Lanham Act (see *Kendall-Jackson*, 150 F.3d at 1046 & 1047 n. 7 (9th Cir. 1998); *Chrysler Corp. v. Vanzant*, 44 F.Supp.2d 1062, 1068 (C.D. Cal. 1999)), as does trade dress infringement (see *Int'l. Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)).

### 1.    Whether Defendants' Use Of Plaintiff's Trade Dress And Trademark Is A Nominative Fair Use

Defendants argue that they are entitled to summary judgment because their use of plaintiff's trade dress and trademark qualifies as a nominative fair use.[96] Plaintiff contends the nominative fair use defense does not apply because San Andreas does not use the Play Pen mark

---

[96]Notice of Motion and Motion of Defendants Rockstar Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment ("Defs.' Mot.") at 7-9.

1  or trade dress as a descriptive substitute.[97]

2           **a.    Fair Use Defenses**

3       There are two fair use defenses available in trade dress or trademark infringement cases

4  – classic and nominative. *See Walking Mountain*, 353 F.3d at 809 (stating that both types of fair

5  use defense are applicable in both trademark and trade dress cases). A defendant's use is classic

6  fair use "'where [he] has used the plaintiff's mark *only* to describe his own product, *and not at*

7  *all to describe the plaintiff's product.*'" *Id.* (quoting *Cairns v. Franklin Mint*, 292 F.3d 1139,

8  1151 (9th Cir. 2002) (emphasis original)). Stated differently, the classic fair use defense "applies

9  only to marks that possess both a primary meaning and a secondary meaning – and only when the

10  mark is used in its primary descriptive sense rather than its secondary trademark sense." *Brother*

11  *Records, Inc. v. Jardine*, 318 F.3d 900, 905 (9th Cir. 2003) (footnote omitted), cert. denied sub

12  nom. *Jardine v. Brother Records, Inc.*, 540 U.S. 824 (2003). See also *Carins*, 292 F.3d at 1150

13  (under the classic fair use defense, "'[a] junior user [of a trademark] is always entitled to use a

14  descriptive term in good faith in its primary, descriptive sense other than as a trademark,'"

15  quoting 2 Thomas J. McCarthy, MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION, § 11:45

16  (4th ed. 2001)); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n. 3 (9th Cir. 2002)

17  ("Although descriptive terms generally do not enjoy trademark protection, a descriptive term can

18  be protected provided that it has acquired 'secondary meaning' in the minds of consumers, i.e.,

19  it has become distinctive of the trademark applicant's goods in commerce," quoting *Park 'N Fly*

20  *v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).

21       Thus, for instance, in *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11

22  F.3d 1460 (9th Cir. 1993), defendant used the descriptive word, "VCR-2" to designate the jack

23  to which a second VCR could be attached. The Ninth Circuit held that this did not infringe

24  plaintiff's trademark for a two-deck videocassette recorder, "VCR-2." See *id.* at 1467 ("A JVC

25  receiver, labeled JVC on the front, would not be mistaken for a Go-Video product because the

26

27       [97]Plaintiff's Opposition to Motion of Defendants Rockstar Games, Inc. and Take-Two

28  Interactive Software, Inc. for Summary Judgment ("Pl.'s Opp.") at 9-11.

1   videocassette jacks on the back were labelled 'VCR 1 and VCR 2,' and reference was made to

2   'VCR 2' in the instruction book and on the remote. No possibility existed that a person would

3   buy the plainly labelled JVC receiver thinking that it was made by Go-Video, because a set of

4   jacks on the back was labelled 'VCR 2.'. . . This was fair use as a matter of law. The uses were

5   descriptive, and there is no evidence from which an inference of bad faith could be drawn"

6   (citations omitted)). See also *Entrepreneur Media*, 279 F.3d at 1143-44 (holding that the owner

7   of *Entrepreneur* magazine had "the exclusive right to use its *trademark* in printed publications

8   pertaining to business opportunities," but did not "have the exclusive right to use the *word*

9   'entrepreneur' *in* any mark identifying a printed publication addressing subjects related to

10  entrepreneurship," and concluding that the name of defendant's public relations firm,

11  "EntrepreneurPR," constituted a classic fair use (emphasis original)); *Brookfield Communications,*

12  *Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999) (holding that

13  defendant could legitimately use the term "Movie Buff" to describe a movie devotee, but was

14  barred from using "MovieBuff," since, without the space, the term was not an English language

15  word and "[was] used to refer to Brookfield's products and services, rather than to mean 'motion

16  picture enthusiast'"); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 270 (2d Cir.

17  1995) (holding that defendant's use of the pine tree shape for a Christmas season air freshner

18  qualified as a classic fair use, and did not infringe plaintiff's rights in its pine tree air freshner

19  design or dress).

20       To prevail on a classic fair use defense, a defendant must show: (1) that it has not utilized

21  the term in dispute as a trademark or service mark; (2) that it has used the term fairly and in good

22  faith; and (3) that it has used the term only to describe its own goods or services. See *Carins*, 292

23  F.3d at 1151; see also 15 U.S.C. § 1115(b)(4) (codifying the classic fair use defense). In the

24  Ninth Circuit, "the classic fair use defense is not available if there is a likelihood of customer

25  confusion as to the origin of the product." *Cairns*, 292 F.3d at 1151. Thus, the classic fair use

26  defense complements the eight factor likelihood of confusion test set forth in *AMF, Inc. v.*

27  *Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). See *id.* ("The classic fair use analysis, therefore,

28  only *complements* the likelihood of customer confusion analysis set forth in *Sleekcraft*" (emphasis

1   original)).[98]

2          The nominative fair use defense, by contrast, applies where the defendant has "'used the

3   plaintiff's mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to*

4   *describe his own product.'*"   *Walking Mountain*, 353 F.3d at 809 (quoting *Carins*, 292 F.3d at

5   1151 (emphasis original)).   In other words, "'[t]he goal of a nominative use is generally for the

6   'purposes of comparison, criticism [or] point of reference.'"   *Id.* (quoting *New Kids on the Block*,

7   971 F.2d at 306)).   See also *New Kids on the Block*, 971 F.2d at 308 (stating that the nominative

8   fair use defense applies to a "class of cases where the use of the trademark does not attempt to

9   capitalize on consumer confusion or to appropriate the cachet of one product for a different one").

10          To prove nominative fair use, a defendant must satisfy three requirements: (1) "the

11   plaintiff's product or service in question must be one not readily identifiable without use of the

12   trademark"; (2) "only so much of the mark or marks may be used as is reasonably necessary to

13   identify the plaintiff's product or service"; and (3) "the user must do nothing that would, in

14   conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."

15   *Walking Mountain*, 353 F.3d at 809 (citing *Cairns*, 292 F.3d at 1151 (internal citation omitted)).

16   See also *New Kids on the Block*, 971 F.2d at 308 ("If the defendant's use of the plaintiff's

17   trademark refers to something other than the plaintiff's product, the traditional fair use inquiry

18   will continue to govern.   But, where the defendant uses a trademark to describe plaintiff's

19   product, rather than its own, we hold that a commercial user is entitled to a nominative fair use

20   defense provided he meets the following three requirements").

21          The nominative fair use test replaces the likelihood of customer confusion analysis set forth

22   in *Sleekcraft*.   See *Walking Mountain*, 353 F.3d at 810 n. 19 ("The nominative fair use test

23   replaces the traditional [*Sleekcraft*] analysis"); *Cairns*, 292 F.3d at 1151 (same).   See also

24   _____

25          [98]In *Sleekcraft*, the Ninth Circuit identified eight factors to be considered in evaluating
    whether a defendant's use of a mark gives rise to a likelihood of consumer confusion:
26   "(1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound
    and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and
27   purchaser care; (7) intent; and (8) likelihood of expansion." See *Dreamwerks Production Group,*
    *Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (citing *Sleekcraft*, 500 F.2d at 348-49).

1  *Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002) (stating that the three-

2  prong test "better evaluates the likelihood of confusion in nominative use cases"). As the Ninth

3  Circuit explained in *Brother Records*, however, "the third requirement of the nominative fair use

4  defense – the lack of anything that suggests sponsorship or endorsement – is merely the other side

5  of the likelihood-of-confusion coin." *Brother Records*, 318 F.3d at 909 n. 5. "Therefore,

6  whereas [the] plaintiff carries the burden of persuasion in a trademark infringement claim to show

7  likelihood of confusion, the nominative fair use defense shifts to the defendant the burden of

8  proving no likelihood of confusion." *Id.* (internal citation omitted).

9  **b.     Applicability Of The Nominative Fair Use Analysis In This Case**

10  Defendants do not assert a classic fair use defense. They argue rather that, to the extent

11  they used plaintiff's trade dress or trademark, it was a nominative fair use. Plaintiff disputes that

12  the defense applies to this case.

13  *New Kids on the Block*, cited by the parties, offers helpful guidance as to when the

14  nominative fair use defense applies. There, the Ninth Circuit explained the defense as follows:

15  "[I]t is often virtually impossible to refer to a particular product for purposes

16  of comparison, criticism, point of reference, or any other such purpose without

17  using the mark. For example, reference to a large automobile manufacturer based

18  in Michigan would not differentiate among the Big Three; reference to a large

19  Japanese manufacturer of home electronics would narrow the field to a dozen or

20  more companies. Much useful social and commercial discourse would be all but

21  impossible if speakers were under threat of an infringement lawsuit every time they

22  made reference to a person, company or product by using its trademark. . . .

23  . . . [W]e may generalize a class of cases where the use of the trademark

24  does not attempt to capitalize on consumer confusion or to appropriate the cachet

25  of one product for a different one. Such *nominative use* of a mark – where the only

26  word reasonably available to describe a particular thing is pressed into service – lies

27  outside the strictures of trademark law: Because it does not implicate the source-

28  identification function that is the purpose of trademark, it does not constitute unfair

competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder." *New Kids on the Block*, 971 F.2d at 306-08 (emphasis in original).

In *New Kids on the Block*, two national newspapers used photographs of members of the musical group New Kids on the Block, along with the group's name, to advertise reader polls regarding the group's popularity. *Id.* at 304. The Ninth Circuit held that defendants' use of the mark was nominative in nature, since the newspapers had used the New Kids trademark to refer to the New Kids themselves, albeit to advertise the newspapers' survey. *Id.* at 308. The court employed a three-pronged test to determine whether defendants were entitled to assert a nominative fair use defense. First, it determined that it was impossible to conduct a survey about the New Kids, or even to talk about the group, without using its trademarked name. See *id.* ("It is no more reasonably possible, however, to refer to the New Kids as an entity than it is to refer to the Chicago Bulls, Volkswagens, or the Boston Marathon without using the trademark. Indeed, how could someone not conversant with the proper names of the individual New Kids talk about the group at all? While plaintiff's trademark certainly deserves protection against copycats and those who falsely claim that the New Kids have endorsed or sponsored them, such protection does not extend to rendering newspaper articles, conversations, polls, and comparative advertising impossible").

Second, the court concluded that the newspapers had referenced the New Kids "only to the extent necessary to identify them as the subject of the polls; they [did] not use the New Kids' distinctive logo or anything else that [was not] needed to make the announcements intelligible to readers." *Id.* Finally, the court held that nothing in the survey suggested sponsorship or endorsement by the New Kids. *Id.* Indeed, at least one of the newspaper announcements "implie[d] quite the contrary by asking whether the New Kids might be 'a turn off.'" *Id.* at 308-09. Since all three requirements were met, the court affirmed summary judgment in favor of the newspapers, notwithstanding the fact that defendants had profited from the survey's use of the New Kids name. See *id.* at 309 ("Where, as here, the use does not imply sponsorship or endorsement, the fact that it is carried on for profit and in competition with the trademark holder's

1    business is beside the point" (citation omitted)).

2        *New Kids on the Block* involved a trademark infringement claim. In *Walking Mountain*,

3    the Ninth Circuit extended the nominative fair use defense to trade dress infringement claims.

4    See *Walking Mountain*, 353 F.3d at 809-10 ("a defendant's use is *nominative* where he or she

5    used the plaintiff's dress to describe or identify the plaintiff's product, even if the defendant's

6    ultimate goal is to describe or identify his or her own product"). In *Walking Mountain*, the

7    defendant, Thomas Forsythe, produced photographs of Barbie in various absurd and sexualized

8    poses, often juxtaposed with vintage kitchen appliances; Forsythe contended that he was

9    attempting in this manner to critique the objectification of women associated with Barbie. See *id.*

10    at 796. The Ninth Circuit held Forsythe's use was nominative, in that his "use of the trade dress

11    or mark [was] grounded in [his] desire to refer to the plaintiff's product as a point of reference

12    for defendant's own work." *Id.* at 810. Stated differently, the Ninth Circuit concluded that

13    "Forsythe used Mattel's Barbie figure and head in his works to conjure up associations of Mattel,

14    while at the same time to identify his own work, which is a criticism and parody of Barbie." *Id.*

15    (citation omitted).

16        The court also held that Forsythe's use of Barbie's trade dress satisfied each element of the

17    nominative fair use test. First, his use of the Barbie figure and head was "reasonably necessary

18    in order to conjure up the Barbie product in a photographic medium." *Id.* at 810; see *id.* at 810-

19    11 (explaining that "[i]t would have been extremely difficult for Forsythe to create a photographic

20    parody of Barbie without actually using the doll"). Second, given the photographic medium and

21    Forsythe's goal of depicting Barbie's social implications, his use of the Barbie torso and head was

22    both reasonable and necessary. *Id.* at 811 (noting that "[i]t would be very difficult for him to

23    represent and describe his photographic parodies of Barbie without using the Barbie likeness").

24    Finally, the court concluded that the third element was satisfied because, although Forsythe

25    advised some galleries that one of his photographs hung in the office of Mattel's President of

26    Production, "[t]he rest of the materials in the[ ] promotional packets sent to galleries reduce[d]

27    the likelihood of any consumer confusion as to Mattel's endorsement of Forsythe's work." *Id.*

28    Moreover, the court noted, "[a]ny reasonable consumer would realize the critical nature of [the]

1   work and its lack of affiliation with Mattel." *Id.*; *see id.* (stating that "[c]ritical works are much

2   less likely to have a perceived affiliation with the original work" (citation omitted)). The Ninth

3   Circuit therefore affirmed the district court's grant of summary judgment in Forsythe's favor on

4   Mattel's trade dress infringement claim.

5          As *New Kids on the Block* and *Walking Mountain* show, the nominative fair use analysis

6   is applied where a defendant's work clearly identifies and intentionally refers to plaintiff's product

7   or service. *See Brother Records, Inc.*, 318 F.3d at 904 ("Following *New Kids*, we have applied

8   the nominative fair use defense in a number of cases. In most of these cases, the nominative fair

9   use defense, as opposed to the classic fair use defense, clearly applied because the defendant used

10  the plaintiff's mark undeniably to refer to the plaintiff's product, even though the defendant's

11  ultimate goal was to describe his own product"). See, e.g., *Cairns*, 292 F.3d 1139, 1152-53,

12  1155 (holding that defendant's use of plaintiff's marks – Princess Diana's name and likeness –

13  to market defendant's Diana-related memorabilia constituted "a permissible nominative fair use");

14  *Playboy Enterprises*, 279 F.3d at 802-05 (holding that a former *Playboy* model's use of the words

15  "playboy" and "playmate" in headlines and banner advertisements on her website was a

16  nominative fair use); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1000, 1009 (9th Cir. 2001)

17  (applying a nominative fair use analysis where the defendant clothing company used the

18  trademarked names and photographs of the plaintiff surfing champions to market shirts that were

19  copies of those worn by plaintiffs in the photographs); *Abdul-Jabbar v. Gen. Motors Corp.*, 85

20  F.3d 407, 409 (9th Cir. 1996) (conducting a nominative fair use analysis where plaintiff, a

21  basketball player who had won an award three years in a row, sued an automobile manufacturer

22  for using his name in a commercial advertising a car that had also won an award three years in

23  a row); *WCVB v. Boston Athletic Ass'n*, 926 F.2d 42, 44 (1st Cir. 1991) (holding that a television

24  station could mention the "Boston Marathon" in its broadcasts); *J.K. Harris & Co., LLC v.

25  Kassel*, 253 F.Supp.2d 1120, 1125-26 (N.D. Cal. 2003) (holding that defendants' use of

26  plaintiff's trade name to criticize the latter's tax services in Internet advertising was a nominative

27  fair use). See also *SSP Agricultural Equipment, Inc. v. Orchard-Rite Ltd.*, 592 F.2d 1096, 1102-

28  03 (9th Cir. 1979) (holding that the defendant company did not infringe plaintiff's rights in its

1  "TROPIC BREEZE" trademark by using the name in competitive advertising); *Volkswagenwerk*

2  *Aktiengesellschaft v. Church*, 411 F.2d 350, 351 (9th Cir. 1969) (holding that the defendant car

3  repair shop could use plaintiff's trademark, "Volkswagen," in a sign stating "Modern Volkswagen

4  Porsche Service"); *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir. 1969) (holding that a

5  perfume manufacturer could advertise its "2d Chance" perfume by stating that the product was

6  indistinguishable from "Chanel No. 5" as long as the advertisement "[did] not contain

7  misrepresentations or create a reasonable likelihood that purchasers will be confused as to the

8  source, identity, or sponsorship of the advertiser's product").

9      As the Ninth Circuit explained in *Playboy Enterprises*, courts must employ *New Kids'*

10  three-part inquiry in nominative use cases because "[w]hen a defendant uses a trademark

11  nominally, the trademark will be identical to the plaintiff's mark, at least in terms of the words

12  in question." *Playboy Enterprises*, 279 F.3d at 801. Consequently, "application of the *Sleekcraft*

13  test, which focuses on the similarity of the mark used by the plaintiff and the defendant, would

14  lead to the incorrect conclusion that virtually all nominative uses are confusing." *Id.*

15      The evidence presented by defendants establishes that the artist(s) responsible for creating

16  the Pig Pen did not design the virtual strip club to identify or refer specifically to the Play Pen.

17  In his declaration, Nikolas Taylor, the Lead Map Artist for the Los Santos section of San

18  Andreas, states that while he and other artists modeled parts of Los Santos on real places, they

19  "purposely changed the names, building designs, and overall look and feel of the real-world

20  places" to make the places fit the Game's cartoon-style world.[99] Although Taylor drew inspiration

21  for the Pig Pen from reference photographs he had taken of Los Angeles and of the Play Pen, he

22  asserts that he "purposely twisted, altered, and distorted the look of the Playpen logo until it

23  became a suitable logo for the Pig Pen, a cartoon-style strip club that fit with the rest of 'East Los

24  Santos', and was consistent with San Andreas' style [and] irreverent tone."[100] Taylor states, for

25  instance, that he designed the exterior of the Pig Pen so that it would look different from the

26  _____

27      [99]Taylor Decl., ¶ 8.  See *id.*, ¶ 5.

28      [100]*Id.*, ¶ 13.

1 │ exterior of the Play Pen in several respects; indeed, he states he modeled the Pig Pen building on

2 │ another location in the neighborhood.[101]  Taylor also changed the color of building "to fit the Pig

3 │ Pen within the overall 'Los Santos' look and feel."[102]

4 │     "Most obviously, [Taylor] used a different name" for the strip club; Taylor contends he

5 │ chose the name "Pig Pen" not to make fun of the Play Pen, but so "it would be obvious to players

6 │ of the Game that this was not a real East Los Angeles strip club, but rather, a parody of an East

7 │ Los Angeles strip club."[103]  Although he retained the words "totally nude" and the silhouette of

8 │ the nude female dancer depicted inside the letter "P," Taylor asserts he did this because he

9 │ believed that "having the nude female silhouette and the words 'totally nude' would help to

10 │ communicate the message that the Pig Pen was a strip club where totally nude women danced."[104]

11 │ He stated: "I ha[ve] seen lots of similar-looking silhouettes on several other strip clubs, and

12 │ thought that these generic elements were common elements of these types of places."[105]  Similarly,

13 │ Taylor testified that his goal in designing the Pig Pen was to "ma[k]e it more follow the theme

14 │ of the game, ma[k]e it more like part of the game, ma[k]e it more part of Los Santos as a virtual

15 │ environment"[106] – not to comment on the Play Pen *per se.*

16 │     Although the evidence indicates that Taylor was primarily, if not solely, responsible for

17 │ creating the Pig Pen,[107] the declaration and deposition testimony of Rowan Hajaj, Head of

18 │

19 │   [101]*Id.,* ¶ 14.

20 │   [102]*Id.*

21 │
22 │   [103]*Id.,* ¶ 15.

23 │   [104]*Id.,* ¶ 16.

24 │   [105]*Id.*

25 │   [106]Helfing Decl., Exh. D (Taylor Depo. at 37:21-24).

26 │   [107]See Taylor Decl., ¶ 13.  See also Helfing Decl., Exh. D (Taylor Depo. at 33:5-13 ("Q

27 │ Did you have anything to do with making the word the PLAYPEN, the PIGPEN, did you convert

28 │ the PLAYPEN into the PIGPEN? A. I created the texture for the exterior of the building using

  reference material and, you know, giving our own like artistic interpretation of it and I did create

1    Strategic and Corporate Development at Rockstar Games,[108] also support the conclusion that *San*

2    *Andreas* does not utilize the Play Pen trade dress or mark to identify, compare, or refer to

3    plaintiff's product or service.   Hajaj asserts that *San Andreas* "parodies the seedy underbelly of

4    Los Angeles,"[109] and that the Pig Pen is a "virtual, cartoon-style strip club" that "is an extremely

5    minor aspect of *San Andreas.*"[110]   He highlights the fact that it is possible to play and even win

6    the Game without passing by or viewing the Pig Pen,[111] and emphasizes that *San Andreas* carries

7    an express disclaimer on its exterior packaging and on its in-game title screen, which states: "The

8    content of this videogame is purely fictional and is not intended to represent any actual person,

9    business, or organization."[112]

10        In sum, defendants' own evidence demonstrates that they did not "'use[ ] the plaintiff's

11   [trade dress and] mark to describe the plaintiff's product.'"   *Walking Mountain*, 353 F.3d at 809

12   (quoting *Carins*, 292 F.3d at 1151).   Defendants' purpose in using plaintiff's trade dress and mark

13   was not specifically to identify, criticize, or refer to the Play Pen, but rather to create a strip club

14   that fit the virtual world of Los Santos, and was consistent with the theme and tone of *San*

---

16   a texture for that.  Q Did you change the word play to pig?  A. Yes, I created that texture")),

17   Exh. E (Hajaj Depo. at 47:5-8 ("I don't know when the idea [for the Pig Pen] was hatched but
     just to clarify my answer, in your question you said was the idea hatched to create a gentleman's

18   club in the game.  Nick Taylor as the artist was entirely responsible from start to finish for the
     generation of the images that he used in the game of the Pigpen"), 59:6-9 ("[A]s we know, the

19   creation, the naming of the gentleman's club that we are referring to in this game, the Pigpen, was

20   entirely a decision made by Nick Taylor")).

21        [108]Hajaj Decl., ¶ 1.

22        [109]*Id.*, ¶ 11.

23        [110]*Id.*, ¶ 12.  See also Taylor Decl., ¶ 12 (stating that "the Pig Pen is a very minor part of

24   'Los Santos' and even a much smaller part of San Andreas").

25        [111]Hajaj, ¶ 13.  See also Taylor Decl., ¶ 11 ("Certain things needed to happen in the
     exterior portion of 'Los Santos' as part of San Andreas' many 'missions.'  We specifically created

26   some of the 'Los Santos' locations to serve as the setting for those 'missions.'  The Pig Pen was

27   not one of those locations").

28        [112]Hajaj Decl., ¶ 16.

31

1   Andreas.   Compare *id.* ("'The goal of a nominative use is generally for the 'purposes of

2   comparison, criticism [or] point of reference,'" quoting *New Kids on the Block*, 971 F.2d at 306).

3   See also 3 Thomas J. McCarthy, MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION, § 23:11

4   (4th ed. 2006) (the nominative fair use test "has been applied to permit parody use of a trademark

5   to *denote the target of the parody*" (emphasis added)).[113]   Because the Pig Pen's name and

6   appearance are not identical to the Play Pen's mark and trade dress, the general "likelihood of

7   confusion" test can be applied, and there is no need to look to the alternative, three-part test

8   articulated in *New Kids on the Block.   See Playboy Enterprises*, 279 F.3d at 801 (explaining that

9   "[w]hen a defendant uses a trademark nominally, the trademark will be identical to the plaintiff's

10  mark, at least in terms of the words in question," and use of the three-part test is necessary

11  because "application of the *Sleekcraft* test, which focuses on the similarity of the mark used by

12  the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nominative

13  uses are confusing").

14        Moreover, because the Game does not specifically identify the Play Pen as such, the

15  elements of the *New Kids* test cannot readily be applied.   See *New Kids on the Block*, 971 F.2d

16  at 308 ("[W]e hold that a commercial user is entitled to a nominative fair use defense provided

17  he meets the following three requirements: First, the product or service in question must be one

18  not *readily identifiable* without use of the trademark; second, only so much of the mark or marks

19  may be used as is reasonably necessary *to identify the product or service*; and third, the user must

20  do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the

21  trademark holder" (emphasis added and footnote omitted)).   See also *id.* at 308 n. 7 (explaining

22  that under the three-part test, "a soft drink competitor would be entitled to compare its product

23  to Coca-Cola or Coke, but would not be entitled to use Coca-Cola's distinctive lettering," citing,

24  *inter alia, Volkswagenwerk*, 411 F.2d at 352 ("Church did not use Volkswagen's distinctive

25  lettering style or color scheme, nor did he display the encircled 'VW' emblem")).

26

27        ───────────────
      [113]See Defendants Rockstar Games, Inc. and Take-Two Interactive Software, Inc.'s Reply

28  Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Reply") at 5.

1    Defendants argue that "[t]he fact . . . the reference here is used to conjure the image of

2    something broader than Plaintiff's mark does not affect the analysis" because "[t]he nominative

3    fair use defense is available 'even if the defendant's ultimate goal is to describe his own

4    product.'"[114] In support, they cite *Walking Mountain*, where "the Ninth Circuit held that the use

5    of images of the torso and head of a 'Barbie' doll was a nominative fair use, even though the work

6    was intended to comment upon 'the social implications of Barbie, including issues of sexuality and

7    body image.'"[115] Defendants also cite *Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120,

8    1141-42 (C.D. Cal. 1998), aff'd. on other grounds, 296 F.3d 894 (9th Cir. 2002), *Clark v.*

9    *American Online Inc.*, No. CV-98-5650 CAS (CWx), 2000 WL 33535712, *3-6 (C.D. Cal. Nov.

10   30, 2000), and *Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F.Supp.2d 1254, 1264 (N.D.

11   Cal. 2003) as authority supporting their view.[116]

12   Defendants are correct that the nominative fair use defense covers use of another's

13   trademark or trade dress even if the goal is ultimately to describe or promote defendant's product.

14   See *Walking Mountain*, 353 F.3d at 809 (stating that "a defendant's use of a plaintiff's mark is

15   *nominative* when he or she "'used the plaintiff's mark to describe the plaintiff's product, *even if*

16   *the defendant's ultimate goal is to describe his own product*,'" quoting *Cairns*, 292 F.3d at 1151

17   (emphasis original)). In *Walking Mountain* and all other cases cited by defendants, however, the

18   alleged infringer's work clearly identified or referenced plaintiff's product or service, even though

19   defendant's ultimate goal in using the trademark or trade dress was to describe or promote his or

20   her product. See *id.* at 810 ("Forsythe's use of the Barbie trade dress is nominative. Forsythe

21   *used Mattel's Barbie figure and head in his works to conjure up associations of Mattel*, while at

22   the same time to identify his own work, which is a criticism and parody of Barbie. Where use

23   of the trade dress or mark is grounded in the *defendant's desire to refer to the plaintiff's product*

24   *as a point of reference for defendant's own work*, a use is nominative" (citation omitted and

25   ──────────────

26   [114]*Id.* at 6 (quoting *Walking Mountain*, 353 F.3d at 809 (emphasis omitted)).

27   [115]*Id.* (quoting *Walking Mountain*, 353 F.3d at 811)).

28   [116]*Id.*

33

1  emphasis added)).  See also *Wham-O, Inc.*, 286 F.Supp.2d at 1263 (finding that defendants' use

2  of the yellow "Slip 'N Slide" in a film qualified as a nominative use because "[n]ominative use

3  is the use of a mark to identify or to refer to the mark-holder's product. . . .  [D]efendants use

4  plaintiff's mark to identify a product not otherwise readily identifiable.  Other verbal formulas

5  (e.g., 'water slide' or 'lubricated plastic sheet') do not capture or identify the toy with adequate

6  specificity, and trademark law does not compel individuals to 'use absurd turns of phrase' simply

7  to avoid trademark liability.  In the film, *defendants intend to identify the slide as a specific*

8  *product; to do so requires the use of the product's name*" (citations and footnote omitted;

9  emphasis added)); *Clark*, 2000 WL 33535712 at *5 ("*[I]t is obvious from the 'context . . . and*

10  *surrounding circumstances' of defendant AOL's use of the service marked name 'Dick Clark' [that*

11  *the use] is descriptive of Dick Clark, the television personality*.  In addition to making reference

12  to 'tun[ing] into Dick Clark,' the Mailer also refers to 'danc[ing] to the Beatles' and 'cruis[ing]

13  in a Thunderbird,' each of which are symbols of the 1950s and 1960s era that the Mailer is

14  designed to evoke.  None of these symbols refers to an Internet service; as evocations of a

15  historical period, the Beatles and Thunderbird names, as well as plaintiffs' 'Dick Clark' name,

16  refer only to themselves.  *Thus, this is a case 'where the defendant uses a trademark ['Dick*

17  *Clark'] to describe the plaintiff's product [Dick Clark, the historical figure], rather than its own,'*

18  and the *New Kids* three-pronged inquiry is appropriate" (citations and footnote omitted; emphasis

19  added)); *Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d at 1141 (stating that the Barbie Girl

20  song "refers to the doll and the values it has come to represent," and "[b]y describing the doll's

21  'life in plastic' and the various ways young consumers play with the doll ('you can brush my hair,

22  undress me everywhere'), the band Aqua is not speaking specifically about its own product, but

23  *rather is commenting on and parodying Mattel's*" (emphasis added));.

24       Here, the evidence presented demonstrates that defendants' intention in creating the Play

25  Pen was not to identify plaintiff's service, but only to describe their own product.  The Game

26  clearly reflects this intention.  Based on the evidence in the record, the court concludes that

27

28

1    defendants are not entitled to assert a nominative fair use defense.[117]   Their motion for summary

2    judgment on this basis is therefore denied.

3           **2.      Whether Defendants' Use Of Plaintiff's Trade Dress And Trademark**

4                   **Is Protected Under The First Amendment**

5           Citing *MCA Records*, 296 F.3d 894, defendants next argue that they are entitled to

6    summary judgment because the First Amendment protects their use of plaintiff's trade dress and

7    trademark.[118]   While plaintiff does not dispute that a First Amendment balancing test applies to

8

9           [117]The "law of the case" doctrine "posits that when a court decides upon a rule of law, that

10   decision should continue to govern the same issues in subsequent stages in the same case."

11   *Arizona v. California*, 460 U.S. 605, 618 (1983).   The law of the case doctrine "does not
     constitute a limitation on the court's power but merely expresses the general practice of refusing

12   to reopen what has been decided."   *Slotkin v. Citizens Cas. Co.*, 614 F.2d 301, 312 (2d Cir.
     1979).   Thus, a court is free to "depart from a prior holding if convinced that it is clearly

13   erroneous and would work a manifest injustice."   *Arizona v. California*, 460 U.S. at 619.   See

14   also *White v. Murtha*, 377 F.2d 428, 431-32 (5th Cir. 1967).   See also *School Dist. No. 1J,
     Multhnomah County v. AC & S Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) ("[R]econsideration is

15   appropriate if the district court (1) is presented with newly discovered evidence, (2) committed

16   clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change
     in controlling law").

17          In its order on defendants' motion to dismiss, the court implied that defendants might be

18   able to prevail on a nominative fair use defense if they could show that they used plaintiff's trade
     dress and trademark to create images of the seedy underbelly of Los Angeles.   (Order Granting

19   in Part and Denying in Part Defendants' Motion to Dismiss, and Granting Defendants' Motion

20   to Strike Claim and Prayer for Disgorgement of Profits at 17 (Aug. 25, 2005) ("MTD Order")
     ("Here, to the extent defendants used plaintiff's trade dress and trademark to parody The Play Pen

21   (see *Walking Mountain*, *supra*, 353 F.3d at 810-11 (parodying Barbie)), or to merely conjure up
     the image of strip clubs in the 'seedy side' of Los Angeles, they may be able to prevail on a

22   nominative fair use defense"))).)   The court did not reach a final conclusion on the availability of
     the nominative fair use defense, however, finding that it was not appropriate to make such a

23   determination in the context of a motion to dismiss.   (See *id.*)   The court's comment, therefore,
     was not a "deci[sion] upon a rule of law."   *Arizona*, 460 U.S. at 618.   In any event, the court

24   finds, upon further review of the case law and review of the factual record as it has been

25   developed, that the mere fact defendants may have sought to "conjure up the image of strip clubs
     in the 'seedy side' of Los Angeles" will not support successful assertion of a nominative fair use

26   defense.   Because the court's earlier comment was clearly erroneous, to base a ruling on it would

27   work a manifest injustice.   As a result, reconsideration is appropriate.

28          [118]Defs.' Mot. at 4-7.

                                                 35

1     this case, it argues that defendants have failed to satisfy the requirements of that test.[119]

2              a.     **Applicability Of The First Amendment Defense In This Case**

3              In *MCA Records*, the Ninth Circuit held that music companies' use of the "Barbie"

4     trademark in a song parodying the doll was entitled to First Amendment protection, and thus not

5     actionable under the Lanham Act. See *MCA Records*, 296 F.3d at 900 ("The First Amendment

6     may offer little protection for a competitor who labels its commercial good with a confusingly

7     similar mark, but '[t]rademark rights do not entitle the owner to quash an unauthorized use of the

8     mark by another who is communicating ideas or expressing points of view,'" quoting *L.L. Bean,*

9     *Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987)). In so holding, the Ninth Circuit

10    adopted the balancing test established by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994

11    (2d Cir. 1989) for assessing use of a trademark in a literary title. See *MCA Records*, 296 F.3d

12    at 902 ("We agree with the Second Circuit's analysis and adopt the *Rogers* standard as our own").

13    The *Rogers* balancing test requires that courts construe the Lanham Act "'to apply to artistic

14    works *only* where the public interest in avoiding consumer confusion *outweighs* the public interest

15    in free expression.'" *Walking Mountain*, 353 F.3d at 807 (quoting *Rogers*, 875 F.2d at 999

16    (emphasis original)). A literary title falls outside the reach of the Lanham Act if it (1) has some

17    artistic relevance and (2) does not explicitly mislead as to the source or content of the work. See

18    *MCA Records*, 296 F.3d at 902 ("[L]iterary titles do not violate the Lanham Act 'unless the title

19    has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance,

20    unless the title explicitly misleads as to the source or the content of the work,'" quoting *Rogers*,

21    296 F.3d at 999). The Ninth Circuit in *MCA Records* found that the Barbie Girl song easily

22    satisfied both requirements, and therefore did not infringe Mattel's trademark. See *id.*

23             Despite the fact that the alleged infringement and unfair competition do not involve the title

24    of their work, defendants argue that the *Rogers* balancing test applies.    As defendants

25    acknowledge,[120] the Ninth Circuit has not definitively determined whether the *Rogers* test should

26    _____

27    [119]Pl.'s Opp. at 5-7.

28    [120]*Id.* at 5.

1    be applied to "non-titular" uses of trade dress and trademarks. See *Walking Mountain*, 353 F.3d

2    at 808. In *Walking Mountain*, the Ninth Circuit commented that a photographer's use of Barbie's

3    head and overall appearance in his works "presumably would present First Amendment concerns

4    similar to those that made us reluctant to apply the Lanham Act as a bar to the artistic uses of

5    Mattel's Barbie trademark in both *MCA* and this case." *Id.* The court did not decide whether the

6    *Rogers* test applied, however, as it found that the case could be decided using the nominative fair

7    use framework. See *id.* at 808 ("But we need not decide how the *MCA/Rogers* First Amendment

8    balancing might apply to Forsythe's use of the Barbie trade dress because we find, on a narrower

9    ground, that it qualifies as nominative fair use").

10        The court's order denying defendants' motion to dismiss expressed doubt regarding

11   application of the *Rogers* test because *Walking Mountain* "suggested that applying the *Rogers* First

12   Amendment balancing test to 'non-titular' uses of trademarks and trade dress infringement claims

13   might be inappropriate, at least when a nominative fair use defense is also available."[121]  See *id.*

14   at 808 n. 14 ("More importantly, if we were to apply the *Rogers* balancing test, we would have

15   to grapple with First Amendment issues. By instead employing the nominative fair use test –

16   which, incidentally works well in a case like this – we are following the time-honored tradition

17   of avoiding constitutional questions where narrower grounds are available"(citations omitted)).

18   Even in *Walking Mountain*, however, the Ninth Circuit stated that "[w]ere the nominative fair use

19   test not available and so attractive to this claim, we very well m[ight] have had to apply *Rogers*."

20   *Id.* at 809 n. 17.

21        Other courts that have considered the issue have extended the *Rogers* First Amendment

22   balancing test to all expressive uses of a trademark or trade dress in artistic works, whether titular

23   or not. See *Cliff Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 495 (2d

24   Cir. 1989) ("We believe that the overall balancing approach of *Rogers* and its emphasis on

25   construing the Lanham Act 'narrowly' when First Amendment values are involved are both

26   relevant in this case [assessing whether the appearance of a book's cover is confusing similar to

27   _____

28        [121]MTD Order at 13.

37

the trademark elements of the cover of another work]. That is to say, in deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion. And just as in *Rogers*, where we said that the expressive element of titles requires more protection than the labeling of ordinary commercial products, so here the expressive element of parodies requires more protection than the labeling of ordinary commercial products. Indeed, we have said, in the context of alleged copyright infringement, that a parody is entitled 'at least' to conjure up the original and can do more. Thus, we hold that "the *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression, a category that includes parody"); 2 Thomas J. McCarthy, MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION, § 10:22 (4th ed. 2006) ("The courts have expanded the *Rogers* balancing approach to encompass all 'works of artistic expression'"). See, e.g., *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 920, 937 (6th Cir. 2003) (applying the *Rogers* test in a case where an artist used the registered mark, "Tiger Woods," in marketing materials that accompanied prints of a painting of the Masters of Augusta golf tournament, although the trademarked words did not appear on the face of the prints or in the title of painting); *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F.Supp. 267, 276-78 (S.D.N.Y. 1992) (finding that defendant's use of certain elements of the cover design of the *Old Farmer's Almanac* to "make[ ] a joking reference to the *Almanac*, as part of a socio-economic commentary," was "entitled to the protections explained by the Court of Appeals in *Rogers v. Grimaldi* and *Cliffs Notes*"); *Ocean Bio-Chem, Inc. v. Turner Network Television, Inc.*, 741 F.Supp. 1546, 1552-53 (S.D. Fla. 1990) (holding, in a case where the owner of the trademark "Star Brite" sued the producers of a fictional television movie that portrayed a fictional company called "Starbrite Batteries" in a bad light, that the film was "entitled to the full extent of protection afforded by the first amendment" and therefore "the Lanham Act must be construed narrowly," citing *Cliff's Notes*, 886 F.2d at 494-95).

Defendants' work is a highly complex video game. It features three virtual cities, each of which contains hundreds of interactive locations created by animated graphics. The Game also incorporates a narrative, and offers an array of musical soundtracks. San Andreas clearly

38

1  qualifies as an "artistic work" entitled to First Amendment protection.  See *Video Software*

2  *Dealers Ass'n v. Schwarzenegger*, 401 F.Supp.2d 1034, 1044 (N.D. Cal. 2005) (stating that video

3  games, "even though mere entertainment, are nonetheless protected by the First Amendment").

4  See also *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 957 (8th Cir. 2003)

5  ("The record in this case includes scripts and story boards showing the storyline, character

6  development, and dialogue of representative video games, as well as excerpts from four video

7  games submitted by the County.  If the first amendment is versatile enough to 'shield [the]

8  painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis

9  Carroll,' we see no reason why the pictures, graphic design, concept art, sounds, music, stories,

10  and narrative present in video games are not entitled to a similar protection.  The mere fact that

11  they appear in a novel medium is of no legal consequence.  Our review of the record convinces

12  us that these 'violent' video games contain stories, imagery, 'age-old themes of literature,' and

13  messages, 'even an "ideology," just as books and movies do.'  Indeed, we find it telling that the

14  County seeks to restrict access to these video games precisely because their content purportedly

15  affects the thought or behavior of those who play them" (citations omitted)); *Video Software*

16  *Dealers Ass'n v. Maleng*, 325 F.Supp.2d 1180, 1184-85 (W.D. Wash. 2004) ("The early

17  generations of video games may have lacked the requisite expressive element, being little more

18  than electronic board games or computerized races.  The games at issue in this litigation,

19  however, frequently involve intricate, if obnoxious, story lines, detailed artwork, original scores,

20  and a complex narrative which evolves as the player makes choices and gains experience.  All of

21  the games provided to the Court for review are expressive and qualify as speech for purposes of

22  the First Amendment.  In fact, it is the nature and effect of the message being communicated by

23  these video games which prompted the state to act in this sphere.  As noted by the Eighth Circuit:

24  'Whether we believe the advent of violent video games adds anything of value to society is

25  irrelevant; guided by the [F]irst [A]mendment, we are obliged to recognize that 'they are as much

26  entitled to the protection of free speech as the best of literature.'  The Court finds that the games

27  at issue are expressive and qualify for the protections of the First Amendment" (citations

28  omitted)).

As the court has found, and as ESS itself argues,[122] defendants did not incorporate plaintiff's trade dress or trademark into the Game to identify the Play Pen. Rather, the undisputed evidence shows that defendants used elements of plaintiff's trade dress and mark to create a cartoon-style strip club that fit the virtual world of East Los Santos, the Game's imaginary version of East Los Angeles, and that conveyed the Series' irreverent humor.[123] Because defendants' use of plaintiff's trade dress and trademark are "part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right," and the nominative fair use defense is unavailable. *Yankee Publ'g Inc.*, 809 F.Supp. at 276. The weight of authority holds that in these circumstances, the *Rogers* test must be applied to strike the proper balance between "the public interest in free expression [and] the public interest in avoiding consumer confusion." *Cliff Notes*, 886 F.2d at 494 (citations omitted)); *Yankee Publ'g Inc.*, 809 F.Supp. at 276 ("Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody, allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech" (citations and footnote omitted)). Cf. *Walking Mountain*, 353 F.3d at 809 n. 17 ("Were the nominative fair use test not available and so attractive to this claim, we very well may have had to apply *Rogers*"). The court therefore turns to the individual elements of the *Rogers* test.

### b.   Whether The Pig Pen Has Artistic Relevance To The Game

To prevail on a First Amendment defense, defendants must first show that the use of plaintiff's trade dress and trademark "surpasses the minimum threshold of artistic relevance to the [work's] content." *Rogers*, 296 F.3d at 999; *MCA Records*, 296 F.3d at 902. Plaintiff argues that defendants have not met this requirement.[124] Specifically, plaintiff contends that while defendants may be entitled, under the First Amendment, to depict "such landmark structures as

---

[122]See Pl.'s Opp. at 15.

[123]See Defs.' Facts, ¶ 30; Pl.'s Statement, ¶ 30.

[124]Pl.'s Opp. at 5-7.

the Watts Towers and the Los Angeles Convention Center for Los Santos, and the Golden Gate Bridge and the Transmerica Pyramid for San Fiero (their virtual version of San Francisco); defendants' use of the Play Pen trade dress and mark does not qualify for protection because the Play Pen logo and other features of its business premises have not "achieved that sort of iconic stature."[125] Plaintiff also assert that "[w]hile the copying of the *architectural style* of the Play Pen building might be relevant to defendants' claimed purpose of achieving a realistic portrayal of the area, their copying of plaintiff's work mark, logo, and trade is not."[126]

The content of San Andreas is undisputed.  San Andreas is a video game that allows players to step into the shoes of Carl Johnson or "CJ," a former gang member,[127] and experience the Game's version of West Coast "gangster" culture.[128]  As CJ, players can visit locations in three cities – Los Santos, San Fierro, and Las Venturas; these virtual metropolises are modeled after Los Angeles, San Francisco, and Las Vegas respectively.[129]  The Game opens with CJ arriving at Los Santos International Airport to attend his mother's funeral.  After leaving the airport, CJ is picked up almost immediately by corrupt police officers, who steal his money and throw him out of their patrol car in the middle of a rival gang's territory.[130]  East Los Santos, the Game's version of East Los Angeles,[131] is a gritty and dangerous urban district; shootouts between

---

[125]*Id.* at 6.

[126]*Id.* at 6-7.

[127]See German Decl., Exh. 9 (PC version of the San Andreas Game), Exh. 10 (Signature Series Guide at 18).

[128]Defs.' Facts, ¶ 12; Pl.'s Statement, ¶ 12.

[129]Defs.' Facts, ¶ 13; Pl.'s Statement, ¶ 13.

[130]German Decl., Exh. 9 (PC version of the San Andreas Game), Exh. 10 (Signature Series Guide at 18).

[131]Defs.' Facts, ¶

warring gangs are common, as are drug dealers and prostitutes.[132] The neighborhood contains cartoon-style liquor stores, ammunition dealers, casinos, pawn shops, bars, strip clubs, and similar types of businesses.[133]

When creating Los Santos, defendants' artists sought to mimic the look and feel of real-life locations and businesses.[134] They altered aspects of the actual locations, however, to fit their vision of Los Santos and the Series' signature brand of humor.[135] For example, the Game features an ammunition store called "Ammu-Nation," located in downtown Los Santos. The advertisement for the store in the San Andreas City Guides states: "AMMU-NATION FOR ALL YOUR DAILY FIREARM NEEDS. NO RECORD NO WORRIES." The advertisement is endorsed by SAGA, the San Andreas Gun Association, whose slogan is "Say Yes to Guns."[136] The "ritzy Rodeo district" of Los Santos contains a retail clothing store called "Victim." The store's advertisement has the word, "VICTIM," with what appears to be a pool of blood on the letters "I" and "C," and the slogan "TO DIE FOR" underneath.[137] During one of the early missions, CJ and his brother Sweet visit the "Cluckin' Bell" drive-thru restaurant just before they become involved in a drive-by shooting and must, as the Signature Series Guide puts it, "Pursue Gang Car Before They Cap Your Homies!"[138]

---

[132]Defs.' Facts, ¶¶ 14, 17; Pl.'s Statement, ¶¶ 14, 17.

[133]Defs.' Facts, ¶ 20; Pl.'s Statement, ¶ 20.

[134]Defs.' Facts, ¶¶ 17, 24; Pl.'s Statement, ¶¶ 17, 24.

[135]Defs.' Facts, ¶¶ 5, 30; Pl.'s Facts, ¶ 5. See Helfing Decl., Exh. D (Taylor Depo. at 37:21-24); Taylor Decl., ¶ 8.

[136]German Decl., Exh. 9 (Grand Theft Auto San Andreas: City Guides ("City Guides") at 23). The PC version of the San Andreas Game is attached to the back cover of the City Guides. (See id.)

[137]Id., Exh. 9 (City Guides at 22).

[138]Id., Exh. 10 (Signature Series Guide at 26). At the hearing, plaintiff argued that its mark was the only trademark used in the game. "Cluckin' Bell," however, is an example of another mark that defendants used in modified form in the Game.

The Pig Pen has artistic relevance to defendants' twisted, irreverent image of urban Los Angeles.  The undisputed evidence shows that in designing the Pig Pen, Nikolas Taylor used reference photographs of the Play Pen and other East Los Angeles locations for inspiration.[139] Taylor made several modifications to the strip club, most obviously changing the name of the business to the "Pig Pen."  In making these changes, Taylor did not specifically intend to parody the patrons of gentlemen's clubs or convey a humorous message about pigs.[140]  Rather, as his deposition and declaration demonstrate, however, Taylor sought to make the strip club fit the virtual environment of Los Santos and the irreverent tone of the Series in general.[141]  Rather than being arbitrary, defendants' decision to borrow the Play Pen trade dress and mark was closely connected to the artistic design of Los Santos and the overall theme of the Game.  See *Rogers*, 875 F.2d at 1001 ("[T]he title 'Ginger and Fred' surpasses the minimum threshold of artistic relevance to the film's content.  The central characters in the film are nicknamed 'Ginger' and 'Fred,' and these names are not arbitrarily chosen just to exploit the publicity value of their real value counterparts but instead have genuine relevance to the film's story").  See also *ETW Corp.*, 332 F.3d at 937 (holding that an artist's use of Tiger Wood's image had artistic relevance to the underlying work, which was a panoramic painting of Woods' victory at the 1997 Masters Tournament, titled *The Masters of Augusta*); *New York Racing Ass'n v. Perlmutter Pub., Inc.*, 959 F.Supp. 578, 582 (N.D.N.Y. 1997) (reaffirming an earlier holding that "the Defendants' use of Plaintiff's marks in the titles of Defendants' paintings serves the artistically relevant purpose of

---

[139]Defs.' Facts, ¶¶ 35, 36; Pl.'s Statement, ¶¶ 35, 36.

[140]Helfing Decl., Exh. D (Taylor Depo. at 65:15-23, 105:17-106:8).

[141]See Taylor Decl., ¶¶ 8-9; Helfing Decl., Exh. D (Taylor Depo. at 105:17-106:8 ("Q. Okay.  Did anything humorous about pigs in any way influence your artistic creation of the PIGPEN?  A. I can't remember. . . . Q. As you sit here today can you think of anything funny about pigs that may have inspired or influenced your artistic rendition of the PIGPEN?  A. *It just seemed, you know, to fit in*" (emphasis added)), 37:19-25 ("Q. Did you have specific reasons for doing the things you did in the creation of the PIGPEN logo?  A. I think the changes that I made to it made it more follow the theme of the game, made it more like part of the game, made it more part of Los Santos as a virtual environment")))).

43

describing the scene depicted in the paintings, . . . that the use of Plaintiff's marks in Defendants' paintings where the mark actually appears in the scene depicted serves the artistically relevant purpose of accurately depicting the scene (realism)" and that "[a]s a result, . . . the Lanham Act should not apply to the Defendants' shirts that display reproductions of these paintings because the interest in free expression outweighs the need to avoid consumer confusion" (footnote omitted)); *Yankee Publ'g Inc.*, 809 F.Supp. at 278 (finding that use of the *Old Farmer's Almanac* cover design in *New York*'s Christmas gift issue was relevant to defendants' "thrift" theme; "Yankee argues that the so-called 'thrift' theme is not consistently pursued and is, indeed, at time[s], contradicted in *New York*'s gift piece. It argues, further, that the offered explanation of the reference to the *Almanac* is disingenuous because the *Almanac* is not synonymous with thrift. The argument is not successful. It is undeniable that the thrift theme is present in the *New York* gift issue. . . . The fact that aspects of the feature also contradict the thrift theme does not belie the existence of the thrift theme. . . . Yankee's assertion that the Almanac is not synonymous with thrift is also irrelevant. Whether rightly or wrongly, farmers, farm values, and the *Almanac* are associated by many with thrift. The fact that the *Almanac* does not expressly proclaim the value of thrift does not undermine the good faith of New York's claim that its reference to the *Almanac* was intended to evoke the value of thrift").[142]

---

[142]A "parody," in the legal sense, is a "'literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule.'" *Walking Mountain*, 353 F.3d at 801 (quoting *Campbell*, 510 U.S. at 580). Under copyright law, "a parodist may claim fair use where he or she uses some of the 'elements of a prior author's composition to create a new one that, at least in part, comments on that author's works.'" *Id.* (same). As explained in *Walking Mountain*:

> "The original work need not be the sole subject of the parody; the parody 'may loosely target an original' as long as the parody 'reasonably could be perceived as commenting on the original or criticizing it, to some degree.' That a parody is in bad taste is not relevant to whether it constitutes fair use; 'it would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work].'" *Id.* (quoting *Campbell*, 510 U.S. at 580-83 (internal citations omitted)).

Courts have applied the concept of parody to the trademark and trade dress contexts as well. See, e.g., *Cliff Notes*, 886 F.2d at 494 ("[T]he keystone of parody is imitation. It is hard to imagine,

1    Plaintiff asserts that defendants cannot satisfy the first requirement of the *Rogers* test

2   because the Play Pen is not as recognizable a landmark as the Los Angeles Convention Center or

3   the Golden Gate Bridge, and also because defendants did not copy everything about the Play Pen,

4   most notably, the architectural style of its building.  Plaintiff cites no authority supporting its

5   argument that these distinctions are material to the *Rogers* inquiry.[143]  If such authority exists, it

6   would contradict *Rogers*, which makes it clear that the court's inquiry is limited to determining

7   whether the title has *some* artistic relevance to the underlying work; it does not extend to assessing

8   whether use of the trade dress or mark is absolutely necessary to the goals of the artist.  See

9

10   _____

11   for example, a successful parody of Time magazine that did not reproduce Time's trademarked
     red border.  A parody must convey two simultaneous – and contradictory – messages: that it is

12   the original, but also that it is not the original and is instead a parody.  To the extent that it does
     only the former but not the latter, it is not only a poor parody but also vulnerable under trademark

13   law, since the customer will be confused"); *Yankee Publ'g Inc.*, 809 F.Supp. at 279 ("Parody

14   implicates an element of ridicule, or at least mockery" (footnote omitted)).

15       The parties dispute whether the Pig Pen is a "parody" of the Play Pen, or part of a larger
     "parody" of Los Angeles.  The court need not decide this question, since parody is not the

16   exclusive form of expression protected under the First Amendment. See *Yankee Publ'g Inc.*, 809

17   F.Supp. at 279 ("But the dispute as to whether *New York*'s cover was parody misses the point.
     Yankee's argument implies that the special considerations emanating from the First Amendment

18   depend on whether the allegedly infringing work is one of parody.  That is not correct.  Because
     unauthorized uses that provoke litigation, both in the copyright and in the trademark field, often

19   involve parody, the decisions often discuss the special latitudes that are afforded to parody.  But
     parody is merely an example of the types of expressive content that are favored in fair use analysis

20   under the copyright law and First Amendment deference under the trademark law.  Indeed, of the
     two leading trademark cases that have explained that deference in the Second Circuit, while *Cliffs*

21   *Notes* dealt with parody, *Rogers v. Grimaldi* did not.  The message of these cases is not merely
     that *parody* is accorded First Amendment deference, but rather that the use of a trademark in the

22   communication *of an expressive message* is accorded such deference" (emphasis in original)).

23       Here, it is undisputed that Taylor designed the Pig Pen to fit the Series' irreverent tone and
     signature brand of humor.  Whether or not his depiction of the Pig Pen is a "parody," it satisfies

24   the first element of the First Amendment balancing test. See *Rogers*, 875 F.2d at 1001; see also

25   *Yankee Publ'g Inc.*, 809 F.Supp. at 276 ("Thus, where the unauthorized use of a trademark is for
     expressive purposes of *comedy*, parody, *allusion*, criticism, news reporting, and commentary, the

26   law requires a balancing of the rights of the trademark owner against the interests of free speech"

27   (citations and footnote omitted; emphasis added)).

28       [143]See Pl.'s Opp. at 6-7.

45

1   *Rogers*, 296 F.3d at 999 (literary titles do not violate the Lanham Act "unless the title has no

2   artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless

3   the title explicitly misleads as to the source or the content of the work"); *MCA Records*, 296 F.3d

4   at 902 (same).

5           The court concludes that defendants' use of the Play Pen trade dress and mark satisfies this

6   standard.  Defendants' aim in creating East Los Santos was to evoke an image of East Los

7   Angeles, but to tweak that image to fit the overall "look and feel" of San Andreas, as well as the

8   narrative of a city overrun by gangs, drug dealers, and prostitutes.  Any visual work that seeks

9   to offer an artistic commentary on a particular subject must use identifiable features of that subject

10  so that the commentary will be understood and appreciated by the consumer.  See *Cliff Notes*, 886

11  F.2d at 494 (stating that the key to a successful parody is imitation); *Yankee Publ'g Inc.*, 809

12  F.Supp. at 277-80 (use of elements of the *Almanac* cover design had artistic relevance to *New

13  York*'s joking reference).  Here, defendants incorporated distinctive elements of the Play Pen

14  name, logo, and trade dress, perhaps not to identify the Play Pen itself, but to create a locale that

15  players would readily recognize as the Game's version of East Los Angeles.  Because defendants'

16  artistic objective was to construct an "East Los Angeles"-like neighborhood in San Andreas, and

17  not to produce an exact replica of East Los Angeles, it was unnecessary for defendants to copy

18  everything about the Play Pen, including the architectural style of its building.  See *Cliff Notes*,

19  886 F.2d at 496 (observing that "while the cover of Spy Notes certainly conjures up the cover of

20  Cliffs Notes, the two differ in many respects").  Compare *New York Ass'n, Inc. v. Perlmutter

21  Pub., Inc.*, No. 95-CV-994 (FJS), 1996 WL 465298, *4-5 (N.D.N.Y. July 19, 1996) (holding,

22  where the stated artistic purpose was realism, that an artist's use of plaintiff's registered

23  "Saratoga" mark in a painting depicting the Saratoga Race Course scoreboard was protected by

24  the First Amendment because "incorporating one of plaintiff's marks in a painting that depicts a

25  scene in which the mark actually exists serves the artistically relevant purpose of accurately

26  depicting that scene," but finding that the First Amendment did not protect "defendants' products

27  that display paintings which incorporate one of plaintiff's marks and the mark does not actually

28  exist in the scene depicted").  Furthermore, it would have been contrary to defendants' aesthetic

theme to put a landmark like the Los Angeles Convention Center or the Golden Gate Bridge in the middle of East Los Santos. While it might have been possible for defendants to mimic a more famous strip club in East Los Angeles, if one exists, the *Rogers* test is not an "absolute necessity" or an "alternative means" test. *Rogers* simply requires that defendants' use of the trademark or trade dress bear *some* artistic relevance to the work. San Andreas satisfies this test.

### c. Whether Defendants' Use Explicitly Misleads As To The Source Or Content Of The Game

The second prerequisite to assertion of a successful First Amendment defense is that the use of the mark not explicitly mislead as to the source or content of the work. *MCA Records*, 296 F.3d at 902; see also *Rogers*, 296 F.3d at 999. It is clear that defendants' use of plaintiff's trade dress and mark does not explicitly mislead consumers as to the *content* of the Game. Although Rockstar Games has advertised San Andreas nationally, both in print and on television, none of these advertisements features an image of the Pig Pen.[144] The Pig Pen does not appear in any promotional literature for San Andreas, nor does it appear on the exterior packaging of the Game.[145] Consequently, consumers are not exposed to the Pig Pen until after they purchase and play the Game.[146] Even then, there is no guarantee that a consumer will actually see the Pig Pen. Although a player is free to visit any location in Los Santos, none of San Andreas's missions requires a player to go to the Pig Pen.[147] It is possible to play the Game for many hours and accomplish all the set missions without ever entering or passing the Pig Pen.[148]

As these facts show, defendants' use of the Play Pen trade dress and mark presents little, if any, chance that consumers will be misled about the content of the Game. Indeed, deception

---

[144]Defs.' Facts, ¶¶ 45, 46; Pl.'s Statement, ¶¶ 45, 46.

[145]Defs.' Facts, ¶¶ 44, 46; Pl.'s Statement, ¶¶ 44, 46.

[146]Defs.' Facts, ¶ 83; Pl.'s Statement, ¶ 83.

[147]Defs.' Facts, ¶ 47; Pl.'s Statement, ¶ 47.

[148]Defs.' Facts, ¶ 49 (Taylor Decl., ¶¶ 11-13; Hajaj Decl., ¶¶ 12, 13; McPherson Decl., Exh. 1 (McPherson Report at 11)).

1   is less likely here than in *Rogers* or *MCA Records*, where the title of the defendant's work

2   incorporated the plaintiff's trademark. See *Rogers*, 875 F.2d at 1001 (holding that the title of the

3   film, "Ginger and Fred," did not explicitly mislead consumers into believing that Ginger Rogers

4   approved or produced the film); *MCA Records*, 296 F.3d at 901 ("There is no doubt that MCA

5   uses Mattel's mark: Barbie is one half of Barbie Girl. But Barbie Girl is the title of a song about

6   Barbie and Ken, a reference that – at least today – can only be to Mattel's famous couple. We

7   expect a title to describe the underlying work, not to identify the producer, and Barbie Girl does

8   just that"). See also *Woodward v. Jackson*, No. 1:03-CV-0844-DFH, 2004 WL 771244, *7 (S.D.

9   Ind. Mar. 25, 2004) (holding that plaintiffs' Lanham Act claim failed "with respect to the

10  erroneous statement in the liner notes that the group had been known as 'Ripples and Waves'

11  before adopting the Jackson 5 name, [since] the representation inside a sealed CD package could

12  not have an effect on the purchasing decision of a consumer," and rejecting plaintiffs' theory that

13  "that some customers might have read the liner notes before buying the CD, either by seeing a

14  friend's copy or an opened store copy" as "merely desperate speculation . . . [that] is inconsistent

15  with the Ninth Circuit's decision in *Rice*, where such exposure to a friend's copy was also

16  possible," citing *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003) (an allegedly

17  false statement on a video jacket that was not available to the buyer until after purchase via

18  telephone could not have affected the purchase decision)).

19       The court also finds that the Pig Pen does not explicitly mislead consumers as to the *source*

20  of defendants' work. Although the Pig Pen incorporates certain elements of the Play Pen's logo,

21  neither the Game nor any promotional materials for San Andreas "contain[ ] [any] explicit

22  indication that [the Play Pen's owners] endorsed the [work] or had a role in producing it."

23  *Rogers*, 875 F.2d at 1001. While the similar font and common use of nude silhouettes might

24  suggest an association between the Play Pen and the Game to some consumers, this is not enough

25  to defeat First Amendment protection under *Rogers*. *Id.*; see also *MCA Records*, 296 F.3d at 902

26  ("The *only* indication that Mattel might be associated with the song is the use of Barbie in the

27  title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a

28  nullity"). Compare *New York Racing Ass'n*, 959 F.Supp. at 583 & n. 11 (finding that the First

1   Amendment permitted the artist to use the "Saratoga" mark to depict a scene of the Saratoga Race

2   Course, since it posed little risk of confusion, and noting that the use of a more prominent mark

3   such as "Coca-Cola" or "GIANTS" would "create a much greater likelihood of consumer

4   confusion than the present case").

5       Plaintiff disputes this, asserting that defendants' use of its trade dress and trademark

6   explicitly misleads consumers about who might have endorsed the Game. It provides no evidence

7   or argument explicating this contention, however.[149] Rather, it relies on arguments regarding the

8   likelihood of confusion, and in particular, on the results of Dr. Carol Scott's consumer survey.

9   As *MCA Records* makes clear, however, when First Amendment interests are implicated, the

10  *Rogers* "explicitly misleading" standard applies, not the traditional "likelihood of confusion" test.

11  See *MCA Records*, 296 F.3d at 900 ("Our likelihood-of-confusion test generally strikes a

12  comfortable balance between the trademark owner's property rights and the public's expressive

13  interests. But when a trademark owner asserts a right to control how we express ourselves . . .

14  applying the traditional test fails to account for the full weight of the public's interest in free

15  expression"); see also *id.* at 901-02 (discussing *Rogers*, and noting that "[i]f a pair of dancing

16  shoes had been labeled Ginger and Fred, a dancer might have suspected that Rogers was

17  associated with the shoes (or at least one of them), just as Michael Jordan has endorsed Nike

18  sneakers that claim to make you fly through the air. But *Ginger and Fred* was not a brand of

19  shoe; it was the title of a movie and, for the reasons explained by the Second Circuit, deserved

20  to be treated differently").

21      In *Rogers*, Ginger Rogers offered a consumer survey similar to Dr. Scott's to support her

22  claim that the "Ginger and Fred" film engendered confusion regarding sponsorship and

23  endorsement. Rogers' survey sampled 201 likely moviegoers; half of the participants were shown

24  a card with the title "Ginger and Fred," and the other half were shown a real advertisement for

25  the movie. *Rogers*, 875 F.2d at 1001 n. 8. Of the 201 persons surveyed, 38 percent expressed

26  the belief that Ginger Rogers had something to do with the film. Of that 38 percent,

27

28      [149]See Pl.'s Opp. at 7.

1  approximately a third responded "yes," to the question, "Do you think Ginger Rogers was

2  involved in any way with the making this film or not?"  Thus, the survey showed that 14 percent

3  of all respondents felt that the title suggested that Rogers had been involved in production of the

4  film.  *Id.*  Despite this survey, the Second Circuit concluded that Ginger Rogers had not raised

5  a genuine issue regarding sponsorship that required submission of the case to the jury.  *Id.* at

6  1001.  It explained:

7  > "The survey evidence, even if its validity is assumed, indicates at most that some

8  > members of the public would draw the incorrect inference that Rogers had some

9  > involvement with the film.  But that risk of misunderstanding, not engendered by

10 > any overt claim in the title, is so outweighed by the interests in artistic expression

11 > as to preclude application of the Lanham Act."  *Id.*

12 See also *ETW Corp.*, 332 F.3d at 937 ("We find, like the court in *Rogers*, that plaintiff's survey

13 evidence, even if its validity is assumed, indicates at most that some members of the public would

14 draw the incorrect inference that Woods had some connection with Rush's print.  The risk of

15 misunderstanding, not engendered by any explicit indication on the face of the print, is so

16 outweighed by the interest in artistic expression as to preclude application of the Act.  We

17 disagree with the dissent's suggestion that a jury must decide where the balance should be struck

18 and where the boundaries should be drawn between the rights conferred by the Lanham Act and

19 the protections of the First Amendment" (footnote omitted)).

20      Dr. Scott surveyed 503 San Andreas players.  Each was shown a screen shot of the Pig Pen

21 and asked what the image called to mind.  Only sixteen of the 503 survey participants mentioned

22 the Play Pen,[150] and only five said they believed the Pig Pen was endorsed by, sponsored by, or

23 affiliated with the Play Pen.[151]  Of the respondents who stated that they had been in a strip club

24 or planned to go to one, only 4.4 percent thought the Pig Pen was endorsed by, sponsored by, or

27     [150]Defs.' Facts, ¶ 68; Pl.'s Statement, ¶ 68.

28     [151]Defs.' Facts, ¶ 81; Pl.'s Statement, ¶ 81.

1    affiliated with the Play Pen.[152]  Dr. Scott's survey demonstrates that the Pig Pen presents a low

2    likelihood of confusion regarding the Play Pen's sponsorship or endorsement of the Game – much

3    lower, in fact, than the survey in *Rogers*.   Rather than undercutting defendants' position,

4    therefore, Dr. Scott's survey results support their contention that the Pig Pen does not explicitly

5    mislead consumers into believing that Play Pen approved, or participated in making, San Andreas.

6    See *Yankee Publ'g Inc.*, 809 F.Supp. at 280 ("Yankee may well be correct in its surmise that

7    many readers may have failed to understand the comic point intended by *New York* in its use of

8    Yankee's trade dress.  The joke is indeed quite complicated. . . .  In *Rogers v. Grimaldi*, the

9    movie title "Ginger and Fred" was highly susceptible to consumer confusion.  Many consumers

10   may have assumed that the movie was in fact an authorized story of Ginger Rogers and Fred

11   Astaire.   Nothing about that title made it obvious that it was otherwise.  The likelihood of

12   confusion in *Rogers v. Grimaldi* was far greater than here for there were no visible signs

13   accompanying the title to show consumers that the movie was not in fact about Rogers and

14   Astaire.  Nonetheless the court found that the First Amendment interests prevailed.  Although

15   *New York*'s position would probably be stronger if its joke had been clearer, the obscurity of its

16   joke does not deprive it of First Amendment support.  First Amendment protections do not apply

17   only to those who speak clearly, whose jokes are funny, and whose parodies succeed" (citations

18   omitted)).

19        This conclusion is further supported by the fact that video games and strip clubs are not

20   related products, and the Play Pen and San Andreas do not directly compete for purchasers.[153]

21   E.S.S. does not contend that it has ever been in the video game business or that it has plans to

22   enter that business.[154]  Rockstar Games and Take-Two Interactive, on the other hand, have never

23

24

25

26        [152]Defs.' Facts, ¶ 82; Pl.'s Statement, ¶ 82.

27        [153]Defs.' Facts, ¶ 69; Pl.'s Statement, ¶ 69.

28        [154]Defs.' Facts, ¶ 79; Pl.'s Statement, ¶ 79.

1    been in the strip club business and have no plans to enter that business.[155]  The difference between

2    the parties' businesses and product lines makes it improbable that a player who sees the Pig Pen

3    and recognizes that it was modeled after the Play Pen, will believe that the owners of the Play Pen

4    endorsed or sponsored the Game.  See *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d

5    658, 666-67 (5th Cir. 2000) ("In general, '[t]he greater the similarity between products and

6    services, the greater the likelihood of confusion.'  But direct competition between the parties'

7    products is not required in order to find a likelihood of confusion.  When products or services are

8    noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection.  The danger

9    of affiliation or sponsorship confusion increases when the junior user's market is one into which

10   the senior user would naturally expand. . . .  'If consumers believe, even though falsely, that the

11   natural tendency of producers of the type of goods marketed by the prior user is to expand into

12   the market for the type of goods marketed by the subsequent user, confusion may be likely'"

13   (citations omitted)); *Yankee Publ'g Inc.*, 809 F.Supp. at 278-79 ("Yankee's contention that *New*

14   *York* was seeking to free ride on Yankee's goodwill simply makes no sense in these

15   circumstances.  The *Old Farmer's Almanac* and *New York* aim at completely different readerships

16   and offer fundamentally different values. . . .  *New York*'s own mark is highly successful with a

17   certain category of reader.  Yankee's trademark is highly successful with a totally different

18   category of reader. There is virtually no likelihood that *Old Farmer's Almanac*'s readership could

19   be wooed successfully to *New York*.  Nor is *Old Farmer Almanac*'s trademark successful among

20   potential readers of New York.  Yankee has offered no persuasive explanation of how New York

21   could gain advantage by attempting to free ride on Yankee's goodwill through a confusing

22   imitation of Yankee's cover").  See also *MCA Records*, 296 F.3d at 902 ("If we see a painting

23   titled 'Campbell's Chicken Noodle Soup,' we're unlikely to believe that Campbell's has branched

24   into the art business.  Nor, upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a

25   Mercedes-Benz?,' would we suspect that she and the carmaker had entered into a joint venture.

26

27   _____

28   [155]Defs.' Facts, ¶ 80; Pl.'s Statement, ¶ 80.

A title tells us something about the underlying work but seldom speaks to its origins").[156]

In sum, the court finds that defendants' use of the Play Pen trade dress and trademark (1) bears some artistic relevance to the Game, and (2) does not explicitly mislead consumers as to the source or content of the Game. Because defendants have met both requirements of the *Rogers* balancing test, they are entitled, as a matter of law, to a First Amendment defense to plaintiff's Lanham Act claims. The court therefore grants defendants' motion for summary judgment on

---

[156]At the hearing, plaintiff raised a slightly different argument: It asserted that defendants had misled consumers by using more of the mark and the trade dress than necessary to achieve their stated artistic purpose. Plaintiff cited no authority in support of this position, and the court is aware of none. It appears that plaintiff may have confused the First Amendment balancing test with the nominative fair use test. To prove nominative fair use, a defendant must show, *inter alia*, that it used "only so much of the mark or marks . . . as [was] reasonably necessary to identify the plaintiff's product or service," and that it did "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Walking Mountain*, 353 F.3d at 908 (citation omitted). The *Rogers* test, by contrast, has no requirement that the defendant use "only so much of the mark or marks . . . as is reasonably necessary" to convey an artistic idea or message. Thus, plaintiff's argument in this regard fails.

Another requirement of the nominative fair use test is that the user of the trademark or trade dress do "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Walking Mountain*, 353 F.3d at 908 (citation omitted) *Rogers*, by contrast, states that an artistically relevant use of a mark falls outside the Lanham Act "unless the title *explicitly misleads* as to the source or the content of the work." *Rogers*, 296 F.3d at 999 (emphasis added)). This standard appears to be less demanding than the comparable aspect of nominative fair use test. Compare *Walking Mountain*, 353 F.3d at 908 (the defendant must have done "nothing that would, in conjunction with the mark, *suggest* sponsorship or endorsement by the trademark holder" (emphasis added)). Defendants could satisfy the third requirement for nominative fair use, since no reasonable player who passed the Pig Pen and recognized that it was modeled after the Play Pen would believe that the Play Pen's owners had endorsed the virtual club. See *Walking Mountain*, 353 F.3d at 811 (stating that, in applying the nominative fair use test, "[c]ritical works are much less likely to have a perceived affiliation with the original work," citing *New Kids on the Block*, 971 F.2d at 309 (finding no suggested sponsorship in part because a poll in a magazine regarding the popularity of the New Kids asked if the New Kids had become a 'turn off'")); see *id.* at 811-12 n. 21 (noting that the Ninth Circuit has "also found for the defendant on this factor even in situations where there was some amount of ambiguity," citing *Cairns*, 292 F.3d at 1154-56 (concluding that there was no suggestion of sponsorship despite an assertion by Franklin Mint in its advertisements that all proceeds would go to Diana's charities and that a Diana porcelain doll was the only *authentic* replica of Diana's famous gown)). Consequently, defendants clearly satisfy *Rogers*' requirement that their use of the trademark and trade dress not explicitly mislead as to source or content.

1  plaintiff's first cause of action.[157]

2     C.   **Plaintiff's Causes Of Action For State Law Trademark Infringement And**

3        **Unfair Competition Claims**

4        Plaintiff's remaining causes of action allege claims for state law trademark infringement

5  under Business & Professions Code § 14330, and unfair competition under Business & Professions

6  Code § 17200 and California common law.  The legal framework used to analyze these claims

7  is substantially the same as the framework used to evaluate Lanham Act claims under federal law.

8  See *Mallard Creek Industries, Inc. v. Morgan*, 56 Cal.App.4th 426, 434 (1997) (analysis for state

9  law trademark infringement is the same as under federal law); *MCA Records*, 296 F.3d at 902 &

10  n. 2 (holding that defendants' successful assertion of a First Amendment defense entitled them to

11  summary judgment on plaintiff's Lanham Act claim, and also on state law claims for unfair

12  competition); *Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir. 1996)

13  ("[S]tate common law claims of unfair competition and actions pursuant to California Business

14  and Professions Code § 17200 are substantially congruent to claims made under the Lanham Act"

15  (internal citations and quotations omitted));[158] *Maljack Prods., Inc. v. Goodtimes Home Video*

16  *Corp.*, 81 F.3d 881, 886 n. 6 (9th Cir. 1996) (same); *Duncan v. Stuetzle*, 76 F.3d 1480, 1491

17  n. 17 (9th Cir. 1996) (same).

18        As the court has found, plaintiff's first cause of action fails because defendants' use of the

19  Play Pen logo is protected under the First Amendment and falls outside the proscriptions of the

20  Lanham Act.  Plaintiff's related state law claims fail for the same reason.  The court therefore

21  ────────────────

22     [157]Defendants raise two additional arguments in support of their motion for summary
   judgment.  They contend that their use of plaintiff's trade dress and mark is not confusing as a
23  matter of law.  (Defs.' Mot. at 10-23.)  They also assert that their use is a non-trademark use.
   (*Id.* at 23-24.)  Because the court has found that defendants have a valid First Amendment defense
24  to the Lanham Act claim, it need not address these additional grounds.

25     [158]Section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business
26  act or practice and unfair, deceptive, untrue or misleading advertising. . . ."  CAL. BUS. & PROF.
   CODE § 17200.  The common law tort of unfair competition is narrower, and "is generally
27  thought to be synonymous with the act of 'passing off' one's goods as those of another."  *Bank*
28  *of the West v. Superior Court*, 2 Cal.4th 1254,1263 (1992).

1 | grants defendants' motion for summary judgment on plaintiff's remaining causes of action as well.

2

### III.  CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted in its entirety.

DATED: July 28, 2006

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE